## MAINE *v.* TAYLOR ET AL.

No. 85–62.   Argued March 24, 1986—Decided June 23, 1986

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 152.

*Cabanne Howard*, Deputy Attorney General of Maine, argued the cause for appellant. With him on the briefs was *James E. Tierney*, Attorney General.

*Jerrold J. Ganzfried* argued the cause for the United States, as appellee under this Court's Rule 10.4, in support of appellant. With him on the brief were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Donald A. Carr, Dirk D. Snel*, and *Margaret A. Hill*.

*E. Paul Eggert* argued the cause for appellee Taylor. With him on the brief was *Robert Edmond Mittel*.

JUSTICE BLACKMUN delivered the opinion of the Court.

Once again, a little fish has caused a commotion. See *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979); *TVA* v. *Hill*, 437 U. S. 153 (1978); *Cappaert* v. *United States*, 426 U. S. 128 (1976). The fish in this case is the golden shiner, a species of minnow commonly used as live bait in sport fishing.

Appellee Robert J. Taylor (hereafter Taylor or appellee) operates a bait business in Maine. Despite a Maine statute prohibiting the importation of live baitfish,[1] he arranged to have 158,000 live golden shiners delivered to him from outside the State. The shipment was intercepted, and a federal grand jury in the District of Maine indicted Taylor for violating and conspiring to violate the Lacey Act Amendments of 1981, 95 Stat. 1073, 16 U. S. C. §§ 3371–3378. Section 3(a)(2)(A) of those Amendments, 16 U. S. C. § 3372(a)(2)(A), makes it a federal crime "to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce . . . any fish or wildlife taken, possessed, transported,

---

[1] "A person is guilty of importing live bait if he imports into this State any live fish, including smelts, which are commonly used for bait fishing in inland waters." Me. Rev. Stat. Ann., Tit. 12, § 7613 (1981).

or sold in violation of any law or regulation of any State or in violation of any foreign law."

Taylor moved to dismiss the indictment on the ground that Maine's import ban unconstitutionally burdens interstate commerce and therefore may not form the basis for a federal prosecution under the Lacey Act. Maine, pursuant to 28 U. S. C. § 2403(b), intervened to defend the validity of its statute, arguing that the ban legitimately protects the State's fisheries from parasites and nonnative species that might be included in shipments of live baitfish. The District Court found the statute constitutional and denied the motion to dismiss. *United States* v. *Taylor*, 585 F. Supp. 393 (Me. 1984). Taylor then entered a conditional plea of guilty pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving the right to appeal the District Court's ruling on the constitutional question. The Court of Appeals for the First Circuit reversed, agreeing with Taylor that the underlying state statute impermissibly restricts interstate trade. *United States* v. *Taylor*, 752 F. 2d 757 (1985). Maine appealed. We set the case for plenary review and postponed consideration of Taylor's challenges to our appellate jurisdiction. 474 U. S. 943 (1985).

I

Maine invokes our jurisdiction under 28 U. S. C. § 1254(2), which authorizes an appeal as of right to this Court "by a party relying on a State statute held by a court of appeals to be invalid as repugnant to the Constitution, treaties or laws of the United States." Appellee, however, contends that this provision applies only to civil cases, and that, in any event, Maine lacks standing to appeal the reversal of a federal conviction. These contentions both relate to the unusual procedural posture of the case: an appeal by a State from the reversal of a federal conviction based on a violation of state law. We consider them in turn.

First, despite its procedural peculiarities, this case fits squarely within the plain terms of § 1254(2): Maine relies on a state statute that the Court of Appeals held to be unconsti-

tutional. Although statutes authorizing appeals as of right to this Court are strictly construed, see, *e. g., Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 247 (1984), nothing in the language or legislative history of § 1254(2) suggests that its scope is limited to civil litigation. In arguing for such a limitation, appellee relies principally on the fact that §§ 1254(1) and (3)—which authorize discretionary review of cases from the Courts of Appeals by writ of certiorari and certification, respectively—both apply explicitly to "any civil or criminal case." [2] Since this express language is absent from § 1254(2), appellee contends that Congress must have intended this Court's appellate jurisdiction over cases from the courts of appeals to remain limited to civil cases, as indeed it was limited prior to the 1925 enactment of § 1254's predecessor. [3]

---

[2] Section 1254 reads in full:

"Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods:

"(1) By writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree;

"(2) By appeal by a party relying on a State statute held by a court of appeals to be invalid as repugnant to the Constitution, treaties or laws of the United States, but such appeal shall preclude review by writ of certiorari at the instance of such appellant, and the review on appeal shall be restricted to the Federal questions presented;

"(3) By certification at any time by a court of appeals of any question of law in any civil or criminal case as to which instructions are desired, and upon such certification the Supreme Court may give binding instructions or require the entire record to be sent up for decision of the entire matter in controversy."

[3] Congress in 1925 amended § 240(b) of the Judicial Code to read as follows:

"Any case in a circuit court of appeals where is drawn in question the validity of a statute of any State, on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, and the decision is against its validity, may, at the election of the party relying on such State statute, be taken to the Supreme Court for review on writ of error or appeal; but in that event a review on certiorari shall not be allowed at the instance of such party, and the review on such writ of error or appeal shall

We find the argument unconvincing. While some statutes governing this Court's jurisdiction, such as §§ 1254(1) and (3), expressly apply to both civil and criminal cases, others are explicitly limited to civil actions. See, *e. g.*, 28 U. S. C. §§ 1252 and 1253. The absence of *either* sort of provision from § 1254(2) hardly demonstrates that Congress had only civil cases in mind, and we see no reason to read such a limitation into the straightforward and unambiguous terms of the statute. This is not a situation where "the sense of the statute and the literal language are at loggerheads," or where adherence to the plain terms of the statute " 'would confer upon this Court a jurisdiction beyond what "naturally and properly belongs to it." ' " *Heckler* v. *Edwards*, 465 U. S. 870, 879 (1984), quoting *Florida Lime & Avocado Growers, Inc.* v. *Jacobsen*, 362 U. S. 73, 94 (1960) (Frankfurter, J., dissenting), in turn quoting *American Security & Trust Co.* v. *District of Columbia*, 224 U. S. 491, 495 (1912). Section 1254(2) serves to ensure that a state statute is struck down by the federal judiciary only when it is found invalid by this Court, or when the parties acquiesce in the decision of a lower federal court. Federal nullification of a state statute is a grave matter whether it occurs in civil litigation or in the course of a criminal prosecution, and review by this Court is particularly warranted in either event.[4]

---

be restricted to an examination and decision of the Federal questions presented in the case." Act of Feb. 13, 1925, § 1, 43 Stat. 939.

Until then, appeals were allowed as of right from decisions of the courts of appeals only in civil cases involving more than $1,000, and not arising under the diversity, admiralty, patent, or revenue jurisdiction of the federal courts. See Act of Mar. 3, 1891, § 6, 26 Stat. 828.

The relevant portion of the 1925 Act was added on the floor of the Senate, and the debates surrounding the amendment contain no suggestion that it was intended to apply only in civil cases. See 66 Cong. Rec. 2753–2754, 2757, 2919–2925 (1925).

[4] Even if this case fell outside the scope of 28 U. S. C. § 1254(2), we would still have discretion under 28 U. S. C. § 2103 to grant review by writ

Appellee's second jurisdictional argument is based on the fact that the only appellant before this Court is the State of Maine—only an intervenor in the District Court—not the United States, which brought the original prosecution.[5] Since the United States and its attorneys have the sole power to prosecute criminal cases in the federal courts, appellee contends that Maine may not seek review of the Court of Appeals' reversal of his conviction. By statute, however, Maine intervened with "all the rights of a party," 28 U. S. C. § 2403(b),[6] and appeals may be taken to this Court under § 1254(2) by any "party relying on a State statute" held invalid under federal law by a Court of Appeals. We previously have recognized that intervenors in lower federal courts may seek review in this Court on their own, so long as they have "a sufficient stake in the outcome of the controversy" to satisfy the constitutional requirement of genuine adversity. *Bryant* v. *Yellen*, 447 U. S. 352, 368 (1980); see

---

of certiorari. See *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 927 (1975); *El Paso* v. *Simmons*, 379 U. S. 497, 502–503 (1965).

[5] The United States filed a timely notice of appeal to this Court, App. 311, but later moved in the Court of Appeals to dismiss its appeal. *Id.*, at 313. This was "[b]ecause the Acting Solicitor General determined that other cases were entitled to priority in selecting the limited number of cases the government would ask this Court to review." Brief for United States 14–15. The Court of Appeals granted the Government's motion. App. 315.

[6] Title 28 U. S. C. § 2403(b) provides:

"In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."

also, *e. g., Diamond* v. *Charles,* 476 U. S. 54, 68 (1986).
Maine's stake in the outcome of this litigation is substantial: if
the judgment of the Court of Appeals is left undisturbed, the
State will be bound by the conclusive adjudication that its im-
port ban is unconstitutional. See, *e. g., Stoll* v. *Gottlieb,* 305
U. S. 165 (1938). And although private parties, and perhaps
even separate sovereigns, have no legally cognizable interest
in the prosecutorial decisions of the Federal Government, cf.,
*e. g., Diamond* v. *Charles, supra,* at 64–65; *Linda R. S.* v.
*Richard D.,* 410 U. S. 614, 619 (1973), a State clearly has a
legitimate interest in the continued enforceability of its own
statutes, see *Diamond* v. *Charles, supra,* at 65; *Alfred L.
Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez,* 458 U. S.
592, 601 (1982). Furthermore, because reversal of the judg-
ment of the Court of Appeals would result in the automatic
reinstatement of appellee's guilty plea, the controversy be-
fore us clearly remains live notwithstanding the Federal Gov-
ernment's decision to abandon its own appeal.[7] We turn to
the merits.

## II

The Commerce Clause of the Constitution grants Congress
the power "[t]o regulate Commerce with foreign Nations, and
among the several States, and with the Indian Tribes." Art.
I, § 8, cl. 3. "Although the Clause thus speaks in terms
of powers bestowed upon Congress, the Court long has rec-
ognized that it also limits the power of the States to erect
barriers against interstate trade." *Lewis* v. *BT Investment
Managers, Inc.,* 447 U. S. 27, 35 (1980). Maine's statute
restricts interstate trade in the most direct manner possible,
blocking all inward shipments of live baitfish at the State's
border. Still, as both the District Court and the Court of

---

[7] The United States advises us that it does not intend to seek dismissal
of the indictment if Maine prevails in this Court. See Brief for United
States 17, n. 17.

Appeals recognized, this fact alone does not render the law unconstitutional. The limitation imposed by the Commerce Clause on state regulatory power "is by no means absolute," and "the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Id.*, at 36.

In determining whether a State has overstepped its role in regulating interstate commerce, this Court has distinguished between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions. While statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits," *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970), statutes in the second group are subject to more demanding scrutiny. The Court explained in *Hughes* v. *Oklahoma*, 441 U. S., at 336, that once a state law is shown to discriminate against interstate commerce "either on its face or in practical effect," the burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means. See also, *e. g., Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 957 (1982); *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 353 (1977); *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354 (1951).

The District Court and the Court of Appeals both reasoned correctly that, since Maine's import ban discriminates on its face against interstate trade, it should be subject to the strict requirements of *Hughes* v. *Oklahoma*, notwithstanding Maine's argument that those requirements were waived by the Lacey Act Amendments of 1981. It is well established that Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid. See, *e. g., Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769 (1945). But because of the important role

the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been "unmistakably clear." *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 91 (1984). The 1981 Amendments of the Lacey Act clearly provide for federal enforcement of valid state and foreign wildlife laws, but Maine identifies nothing in the text or legislative history of the Amendments that suggests Congress wished to validate state laws that would be unconstitutional without federal approval.

Before this Court, Maine concedes that the Lacey Act Amendments do not exempt state wildlife legislation from scrutiny under the Commerce Clause. See Reply Brief for Appellant 3, n. 2. The State insists, however, that the Amendments should lower the *intensity* of the scrutiny that would otherwise be applied. We do not agree. An unambiguous indication of congressional intent is required before a federal statute will be read to authorize otherwise invalid state legislation, regardless of whether the purported authorization takes the form of a flat exemption from Commerce Clause scrutiny or the less direct form of a reduction in the level of scrutiny. Absent "a clear expression of approval by Congress," any relaxation in the restrictions on state power otherwise imposed by the Commerce Clause unacceptably increases "the risk that unrepresented interests will be adversely affected by restraints on commerce." *South-Central Timber, supra,* at 92.

In this case, there simply is no unambiguous statement of any congressional intent whatsoever "to alter the limits of state power otherwise imposed by the Commerce Clause," *United States* v. *Public Utilities Comm'n of California*, 345 U. S. 295, 304 (1953). In arguing to the contrary, Maine relies almost exclusively on the following findings in the Senate Report on the Lacey Act Amendments:

"It is desirable to extend protection to species of wild-life not now covered by the Lacey Act, and to plants which are presently not covered at all. States and for-eign government are encouraged to protect a broad vari-ety of species. Legal mechanisms should be supportive of those governments." S. Rep. No. 97–123, pp. 3–4 (1981).

Maine reads this passage, particularly the last sentence, to direct federal courts to treat state wildlife laws more le-niently. We find this interpretation not only less than obvi-ous but positively strained; by far the more natural reading of the last sentence is that it refers only to the availability of federal investigative and prosecutorial resources to enforce *valid* state wildlife laws. The passage certainly does not make "unmistakably clear" that Congress intended in 1981 to alter in any way the level of Commerce Clause scrutiny ap-plied to those laws. Maine's ban on the importation of live baitfish thus is constitutional only if it satisfies the require-ments ordinarily applied under *Hughes* v. *Oklahoma* to local regulation that discriminates against interstate trade: the statute must serve a legitimate local purpose, and the pur-pose must be one that cannot be served as well by available nondiscriminatory means.

## III

The District Court found after an evidentiary hearing that both parts of the *Hughes* test were satisfied, but the Court of Appeals disagreed. We conclude that the Court of Appeals erred in setting aside the findings of the District Court. To explain why, we need to discuss the proceedings below in some detail.

## A

The evidentiary hearing on which the District Court based its conclusions was one before a Magistrate. Three scientific experts testified for the prosecution and one for the defense. The prosecution experts testified that live baitfish imported

into the State posed two significant threats to Maine's unique and fragile fisheries.[8]  First, Maine's population of wild fish—including its own indigenous golden shiners—would be placed at risk by three types of parasites prevalent in out-of-state baitfish, but not common to wild fish in Maine.  See, e. g., App. 39–55.[9]  Second, nonnative species inadvertently included in shipments of live baitfish could disturb Maine's aquatic ecology to an unpredictable extent by competing with native fish for food or habitat, by preying on native species, or by disrupting the environment in more subtle ways.  See, e. g., id., at 59–70, 141–149.[10]

The prosecution experts further testified that there was no satisfactory way to inspect shipments of live baitfish for parasites or commingled species.[11]  According to their testimony, the small size of baitfish and the large quantities in which they are shipped made inspection for commingled species "a physical impossibility."  Id., at 81.[12]  Parasite inspection posed a separate set of difficulties because the examination procedure required destruction of the fish.  Id., at 81–82,

---

[8] One prosecution witness testified that Maine's lakes contain unusually clean water and originally supported "a rather delicate community of just a few species of fish."  App. 57.  Another stressed that "no other state . . . has any real landlocked salmon fishing.  You come to Maine for that or you live in Maine for that."  Id., at 137.

[9] Two of these types of parasites were found in appellee's confiscated shipment of golden shiners.  See United States v. Taylor, 585 F. Supp. 393, 395–396 (Me. 1984).

[10] Although appellee's shipment was not found to contain any fish other than golden shiners, it did contain "some polliwogs and . . . some crustacean crawfish."  App. 69.  There was testimony suggesting that these could pose the same ecological risks as nonnative fish.  See id., at 70.

[11] The expert who examined appellee's shipment testified that, although his inspection of the shipment revealed only two of the three parasites he described as prevalent in baitfish outside Maine, "I certainly could not put my signature on a certificate to say that [none of the third parasite] was present in that lot."  Id., at 85.

[12] The shipment intercepted in this case contained approximately 158,000 fish, with about 70 specimens to the pound.  Id., at 80.

195.   Although statistical sampling and inspection tech-
niques had been developed for salmonids (*i. e.*, salmon and
trout), so that a shipment could be certified parasite-free
based on a standardized examination of only some of the fish,
no scientifically accepted procedures of this sort were avail-
able for baitfish.   See, *e. g.*, *id.*, at 71, 184, 193–194.[13]

Appellee's expert denied that any scientific justification
supported Maine's total ban on the importation of baitfish.
*Id.*, at 241.   He testified that none of the three parasites dis-
cussed by the prosecution witnesses posed any significant
threat to fish in the wild, *id.*, at 206–212, 228–232, and that
sampling techniques had not been developed for baitfish pre-
cisely because there was no need for them.   *Id.*, at 265–266.
He further testified that professional baitfish farmers raise
their fish in ponds that have been freshly drained to ensure
that no other species is inadvertently collected.   *Id.*, at
239–240.

Weighing all the testimony, the Magistrate concluded that
both prongs of the *Hughes* test were satisfied, and accord-
ingly that appellee's motion to dismiss the indictment should
be denied.   Appellee filed objections, but the District Court,
after an independent review of the evidence, reached the
same conclusions.   First, the court found that Maine "clearly
has a legitimate and substantial purpose in prohibiting the
importation of live bait fish," because "substantial uncertain-
ties" surrounded the effects that baitfish parasites would
have on the State's unique population of wild fish, and the
consequences of introducing nonnative species were simi-

---

[13] According to the prosecution testimony, the design of sampling and
inspection techniques must take into account the particular parasites of
concern, and baitfish parasites differ from salmonid parasites.   See, *e. g.*,
*id.*, at 184, 193–194.   Appellee's expert agreed.   *Id.*, at 237, 265–267.
There was also testimony that the physical layout of bait farms makes in-
spection at the source of shipment particularly difficult, and that border
inspections are not feasible because the fish would die in the time it takes
to complete the tests.   *Id.*, at 75–79.

larly unpredictable. 585 F. Supp., at 397.[14] Second, the court concluded that less discriminatory means of protecting against these threats were currently unavailable, and that, in particular, testing procedures for baitfish parasites had not yet been devised. *Id.*, at 398. Even if procedures of this sort could be effective, the court found that their development probably would take a considerable amount of time. *Id.*, at 398, n. 11.[15]

Although the Court of Appeals did not expressly set aside the District Court's finding of a legitimate local purpose, it noted that several factors "cast doubt" on that finding. 752 F. 2d, at 762. First, Maine was apparently the only State to bar all importation of live baitfish. See *id.*, at 761. Second, Maine accepted interstate shipments of other freshwater fish, subject to an inspection requirement. Third, "an aura

---

[14] For several reasons, the District Court discounted the testimony of appellee's expert that baitfish parasites did not pose so serious a threat as disease organisms found in salmonids. The court noted that "considerable scientific debate" surrounded even the threat posed by salmonid diseases, that appellee's expert testified largely about the effects that baitfish parasites had in commercial hatcheries rather than in the wild, and that he was unfamiliar with northeast fisheries. 585 F. Supp., at 397.

[15] While the District Court approved the Magistrate's general finding that "there are no obviously workable alternatives to the outright prohibition of importation," *id.*, at 398, neither the court nor the Magistrate made any specific finding as to whether Maine could adequately protect against the inadvertent introduction of nonnative species by allowing baitfish to be imported only from professional bait farmers using freshly drained ponds. There was conflicting evidence on this point. Appellee's expert suggested that such methods largely eliminated the problem of commingled species, App. 239–240, but a prosecution witness testified that complete success was "unlikely." *Id.*, at 170. See also *id.*, at 150 (prosecution testimony that shipments cannot be screened reliably for commingled species because "[t]his is a business. You have living material that you have to move; you can't hold them in tanks and this kind of thing for any length of time"). We are in no position to resolve this factual dispute, and we conclude in any event that the District Court's findings regarding parasites adequately support the constitutionality of the challenged statute.

of economic protectionism" surrounded statements made in 1981 by the Maine Department of Inland Fisheries and Wildlife in opposition to a proposal by appellee himself to repeal the ban. *Ibid.* Finally, the court noted that parasites and nonnative species could be transported into Maine in shipments of nonbaitfish, and that nothing prevented fish from simply swimming into the State from New Hampshire. *Id.*, at 762, n. 12.

Despite these indications of protectionist intent, the Court of Appeals rested its invalidation of Maine's import ban on a different basis, concluding that Maine had not demonstrated that any legitimate local purpose served by the ban could not be promoted equally well without discriminating so heavily against interstate commerce. Specifically, the court found it "difficult to reconcile" Maine's claim that it could not rely on sampling and inspection with the State's reliance on similar procedures in the case of other freshwater fish. *Id.*, at 762.[16]

Following the reversal of appellee's conviction, Maine and the United States petitioned for rehearing on the ground that the Court of Appeals had improperly disregarded the District Court's findings of fact. The court denied the petitions, concluding that, since the unavailability of a less discriminatory alternative "was a mixed finding of law and fact," a reviewing court "was free to examine carefully the factual record and to draw its own conclusions." *Id.*, at 765.

### B

Although the proffered justification for any local discrimination against interstate commerce must be subjected to "the strictest scrutiny," *Hughes* v. *Oklahoma*, 441 U. S., at 337, the empirical component of that scrutiny, like any other form of factfinding, " 'is the basic responsibility of district courts,

---

[16] The court also noted that "a restriction on the number and size of importations would be less restrictive than a total ban," 752 F. 2d, at 762, but it identified no reason to believe that such a restriction would protect against parasites and commingled species as effectively as a ban.

rather than appellate courts,'" *Pullman-Standard* v. *Swint*, 456 U. S. 273, 291 (1982), quoting *DeMarco* v. *United States*, 415 U. S. 449, 450, n. (1974). As this Court frequently has emphasized, appellate courts are not to decide factual questions *de novo*, reversing any findings they would have made differently. See, *e. g.*, *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985); *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 123 (1969). The Federal Rules of Criminal Procedure contain no counterpart to Federal Rule of Civil Procedure 52(a), which expressly provides that findings of fact made by the trial judge "shall not be set aside unless clearly erroneous." But the considerations underlying Rule 52(a)—the demands of judicial efficiency, the expertise developed by trial judges, and the importance of first-hand observation, see *Anderson*, *supra*, at 574–575—all apply with full force in the criminal context, at least with respect to factual questions having nothing to do with guilt. Accordingly, the "clearly erroneous" standard of review long has been applied to nonguilt findings of fact by district courts in criminal cases. See *Campbell* v. *United States*, 373 U. S. 487, 493 (1963); 2 C. Wright, Federal Practice and Procedure § 374 (2d ed. 1982). We need not decide now whether all such findings should be reviewed under the "clearly erroneous" standard, because appellee concedes that the standard applies to the factual findings made by the District Court in this case. See Tr. of Oral Arg. 27. We note, however, that no broader review is authorized here simply because this is a constitutional case, or because the factual findings at issue may determine the outcome of the case. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 501 (1984); *Pullman-Standard* v. *Swint*, 456 U. S., at 287.[17]

---

[17] In support of its conclusion that it "was free to examine carefully the factual record and to draw its own conclusions," *id.*, at 765, the Court of Appeals cited *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), and *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318 (1977). The question in each of these cases was whether a given set of facts amounted

No matter how one describes the abstract issue whether "alternative means could promote this local purpose as well without discriminating against interstate commerce," *Hughes* v. *Oklahoma,* 441 U. S., at 336, the more specific question whether scientifically accepted techniques exist for the sampling and inspection of live baitfish is one of fact, and the District Court's finding that such techniques have not been devised cannot be characterized as clearly erroneous. Indeed, the record probably could not support a contrary finding. Two prosecution witnesses testified to the lack of such procedures, and appellee's expert conceded the point, although he disagreed about the need for such tests. See App. 74–75, 184, 265–266. That Maine has allowed the importation of other freshwater fish after inspection hardly demonstrates that the District Court clearly erred in crediting the corroborated and uncontradicted expert testimony that standardized inspection techniques had not yet been developed for baitfish. This is particularly so because the text of the permit statute suggests that it was designed specifically to regulate importation of salmonids, for which, the experts testified, testing procedures had been developed.[18]

---

to discrimination forbidden by the Commerce Clause; in neither case did this Court reject underlying factual findings made by the trial court. Indeed, there were no such findings to reject—the facts were stipulated in *Bacchus,* see 468 U. S., at 269, and *Boston Stock Exchange* was decided on a motion to dismiss, see 429 U. S., at 320.

[18] The statute provides: "The commissioner *may* grant permits" for the importation of freshwater fish upon an application that describes the fish and their source and includes "[a] statement from a recognized fish pathologist, from a college or university, from a state conservation department or from the United States Fish and Wildlife Service, certifying that the fish . . . are from sources which show no evidence of viral hemorrhagic septicemia, infectious pancreatic necrosis, infectious hematopoietic necrosis, Myxosomo cerebralis or other diseases which may threaten fish stocks within the State." Me. Rev. Stat. Ann., Tit. 12, § 7202 (1981) (emphasis added). The listed diseases all were identified at the hearing before the Magistrate as salmonid disorders. See App. 193.

Before this Court, appellee does not argue that sampling and inspection procedures already exist for baitfish; he contends only that such procedures "could be easily developed." Brief for Appellee 25. Perhaps this is also what the Court of Appeals meant to suggest. Unlike the proposition that the techniques already exist, the contention that they could readily be devised enjoys some support in the record. Appellee's expert testified that developing the techniques "would just require that those experts in the field . . . get together and do it." App. 271. He gave no estimate of the time and expense that would be involved, however, and one of the prosecution experts testified that development of the testing procedures for salmonids had required years of heavily financed research. See *id.*, at 74. In light of this testimony, we cannot say that the District Court clearly erred in concluding, 585 F. Supp., at 398, n. 11, that the development of sampling and inspection techniques for baitfish could be expected to take a significant amount of time.

More importantly, we agree with the District Court that the "abstract possibility," *id.*, at 398, of developing acceptable testing procedures, particularly when there is no assurance as to their effectiveness, does not make those procedures an "[a]vailabl[e] . . . nondiscriminatory alternativ[e]," *Hunt*, 432 U. S., at 353, for purposes of the Commerce Clause. A State must make reasonable efforts to avoid restraining the free flow of commerce across its borders, but it is not required to develop new and unproven means of protection at an uncertain cost. Appellee, of course, is free to work on his own or in conjunction with other bait dealers to develop scientifically acceptable sampling and inspection procedures for golden shiners; if and when such procedures are developed, Maine no longer may be able to justify its import ban. The State need not join in those efforts, however, and it need not pretend they already have succeeded.

## C

Although the Court of Appeals did not expressly overturn the District Court's finding that Maine's import ban serves a legitimate local purpose, appellee argues as an alternative ground for affirmance that this finding should be rejected. After reviewing the expert testimony presented to the Magistrate, however, we cannot say that the District Court clearly erred in finding that substantial scientific uncertainty surrounds the effect that baitfish parasites and nonnative species could have on Maine's fisheries. Moreover, we agree with the District Court that Maine has a legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible. "[T]he constitutional principles underlying the commerce clause cannot be read as requiring the State of Maine to sit idly by and wait until potentially irreversible environmental damage has occurred or until the scientific community agrees on what disease organisms are or are not dangerous before it acts to avoid such consequences." 585 F. Supp., at 397.

Nor do we think that much doubt is cast on the legitimacy of Maine's purposes by what the Court of Appeals took to be signs of protectionist intent. Shielding in-state industries from out-of-state competition is almost never a legitimate local purpose, and state laws that amount to "simple economic protectionism" consequently have been subject to a "virtually *per se* rule of invalidity." *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978); accord, *e. g.*, *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 471 (1981).[19] But

---

[19] This rule has been applied not only to laws motivated solely by a desire to protect local industries from out-of-state competition, but also to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade, for "the evil of protectionism can reside in legislative means as well as legislative ends." *Philadelphia* v. *New Jersey*, 437 U. S., at 626. The Court has held, for example, that New Jersey may not conserve the disposal capacity of its landfill sites by banning importation of

there is little reason in this case to believe that the legitimate justifications the State has put forward for its statute are merely a sham or a *"post hoc* rationalization." *Hughes,* 441 U. S., at 338, n. 20. In suggesting to the contrary, the Court of Appeals relied heavily on a 3-sentence passage near the end of a 2,000-word statement submitted in 1981 by the Maine Department of Inland Fisheries and Wildlife in opposition to appellee's proposed repeal of the State's ban on the importation of live baitfish:

> "'[W]e can't help asking why we should spend our money in Arkansas when it is far better spent at home? It is very clear that much more can be done here in Maine to provide our sportsmen with safe, home-grown bait. There is also the possibility that such an industry could develop a lucrative export market in neighboring states.'" 752 F. 2d, at 760, quoting Baitfish Importation: The Position of the Maine Department of Inland Fisheries and Wildlife, App. 294, 309–310.

We fully agree with the Magistrate that "[t]hese three sentences do not convert the Maine statute into an economic pro-

wastes, see *ibid.,* and that Oklahoma may not fight depletion of its population of natural minnows by prohibiting their commercial exportation, see *Hughes* v. *Oklahoma,* 441 U. S. 322 (1979). In each case, out-of-state residents were forced to bear the brunt of the conservation program for no apparent reason other than that they lived and voted in other States. See *Philadelphia* v. *New Jersey,* 437 U. S., at 629; *Hughes,* 441 U. S., at 337–338, and n. 20. Not all intentional barriers to interstate trade are protectionist, however, and the Commerce Clause "is not a guaranty of the right to import into a state whatever one may please, absent a prohibition by Congress, regardless of the effects of the importation upon the local community." *Robertson* v. *California,* 328 U. S. 440, 458 (1946). Even overt discrimination against interstate trade may be justified where, as in this case, out-of-state goods or services are particularly likely for some reason to threaten the health and safety of a State's citizens or the integrity of its natural resources, and where "outright prohibition of entry, rather than some intermediate form of regulation, is the only effective method of protecti[on]." *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27, 43 (1980).

tectionism measure." App. to Juris. Statement E–6, n. 4.[20] As the Magistrate pointed out, the context of the statements cited by appellee "reveals [they] are advanced not in direct support of the statute, but to counter the argument that inadequate bait supplies in Maine require acceptance of the environmental risks of imports. Instead, the Department argues, Maine's own bait supplies can be increased." *Ibid.* Furthermore, the comments were made by a state administrative agency long after the statute's enactment, and thus constitute weak evidence of legislative intent in any event. See *ibid.*[21]

The other evidence of protectionism identified by the Court of Appeals is no more persuasive. The fact that Maine allows importation of salmonids, for which standardized sampling and inspection procedures are available, hardly demonstrates that Maine has no legitimate interest in prohibiting the importation of baitfish, for which such procedures have not yet been devised. Nor is this demonstrated by the fact that other States may not have enacted similar bans, espe-

---

[20] The District Court did not address appellee's argument that the import ban was protectionist, because it did not believe that appellee had objected to the Magistrate's rejection of that argument. See 585 F. Supp., at 395, n. 5. The Court of Appeals disagreed, concluding that appellee's objections to the Magistrate's recommended decision incorporated all the arguments included in his motion to dismiss. See 752 F. 2d, at 760, n. 7. In the objections he filed with the District Court, appellee did not specifically contend that the statute was protectionist, but he concluded by asking that the indictment be dismissed "[f]or the reasons stated herein and *also for those reasons stated in Defendant's Memorandum of Law in Support of Motion to Dismiss.*" Defendant's Objection to the Magistrate's Recommended Decision on Defendant's Motion to Dismiss Indictment 4 (Mar. 12, 1984) (emphasis added). Because we think the Magistrate was clearly right to reject the argument that Maine's bait statute constitutes economic protectionism, we need not decide whether this catchall language sufficed to preserve the argument for later review. Cf. *Thomas* v. *Arn*, 474 U. S. 140, 148–149 (1985).

[21] The import ban was originally enacted in 1959. See 1959 Me. Acts, ch. 112.

cially given the testimony that Maine's fisheries are unique and unusually fragile.[22]   Finally, it is of little relevance that fish can swim directly into Maine from New Hampshire.   As the Magistrate explained: "The impediments to complete success . . . cannot be a ground for preventing a state from using its best efforts to limit [an environmental] risk."   *Id.*, at E–10, n. 8.

## IV

The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values.   As long as a State does not needlessly obstruct interstate trade or attempt to "place itself in a position of economic isolation," *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 527 (1935), it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.   The evidence in this case amply supports the District Court's findings that Maine's ban on the importation of live baitfish serves legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives.   This is not a case of arbitrary discrimination against interstate commerce; the

---

[22] Although Maine's flat statutory ban on the importation of all live baitfish is apparently unique, Minnesota prohibits the use of imported minnows for bait purposes "[e]xcept as otherwise specifically permitted," Minn. Stat. § 101.42, subd. 6 (1984), and several other States require administrative approval for the importation and introduction of any live fish, see, *e. g.*, Utah Code Ann. § 23–15–12 (1984); Va. Code § 28.1–183.2 (1985); Wis. Stat. § 29.535 (Supp. 1985); cf. S. D. Codified Laws § 41–14–30 (1977) (minnows may be transported "into or through South Dakota" only pursuant to a 12-hour permit).   Other States have granted authority to their wildlife agencies to prohibit the importation of particular species.   See, *e. g.*, Ala. Code § 9–2–13 (1980); N. C. Gen. Stat. § 113–160 (1983); cf. Nev. Rev. Stat. § 503.310(1) (1985) ("The [state wildlife] commission is empowered to regulate or prohibit the use of live bait in fishing to the end that no undesirable species of fish intentionally or unintentionally may be introduced into the public waters of this state").

record suggests that Maine has legitimate reasons, "apart from their origin, to treat [out-of-state baitfish] differently," *Philadelphia* v. *New Jersey,* 437 U. S., at 627. The judgment of the Court of Appeals setting aside appellee's conviction is therefore reversed.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

There is something fishy about this case. Maine is the only State in the Union that blatantly discriminates against out-of-state baitfish by flatly prohibiting their importation. Although golden shiners are already present and thriving in Maine (and, perhaps not coincidentally, the subject of a flourishing domestic industry), Maine excludes golden shiners grown and harvested (and, perhaps not coincidentally, sold) in other States. This kind of stark discrimination against out-of-state articles of commerce requires rigorous justification by the discriminating State. "When discrimination against commerce of the type we have found is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333, 353 (1977).

Like the District Court, the Court concludes that uncertainty about possible ecological effects from the possible presence of parasites and nonnative species in shipments of out-of-state shiners suffices to carry the State's burden of proving a legitimate public purpose. *Ante,* at 142–143, 148. The Court similarly concludes that the State has no obligation to develop feasible inspection procedures that would make a total ban unnecessary. *Ante,* at 147. It seems clear, however, that the presumption should run the other way. Since the State engages in obvious discrimination against out-of-state commerce, it should be put to its proof. Ambiguity about dangers and alternatives should actually defeat, rather than sustain, the discriminatory measure.

This is not to derogate the State's interest in ecological purity. But the invocation of environmental protection or public health has never been thought to confer some kind of special dispensation from the general principle of nondiscrimination in interstate commerce. "A different view, that the ordinance is valid simply because it professes to be a health measure, would mean that the Commerce Clause of itself imposes no restraints on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354 (1951). If Maine wishes to rely on its interest in ecological preservation, it must show that interest, and the infeasibility of other alternatives, with far greater specificity. Otherwise, it must further that asserted interest in a manner far less offensive to the notions of comity and cooperation that underlie the Commerce Clause.

Significantly, the Court of Appeals, which is more familiar with Maine's natural resources and with its legislation than we are, was concerned by the uniqueness of Maine's ban. That court felt, as I do, that Maine's unquestionable natural splendor notwithstanding, the State has not carried its substantial burden of proving why it cannot meet its environmental concerns in the same manner as other States with the same interest in the health of their fish and ecology. Cf. *ante*, at 151, n. 22 (describing less restrictive procedures in other States).

I respectfully dissent.