NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0625n.06
Filed: August 23, 2006

No. 05-4458

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|                                          |   |                            |
|------------------------------------------|---|----------------------------|
| FARID HAMID ASSI,                        | ) |                            |
|                                          | ) | ON PETITION FOR REVIEW     |
| Petitioner,                              | ) | OF A DECISION OF THE       |
|                                          | ) | BOARD OF IMMIGRATION       |
| v.                                       | ) | APPEALS                    |
|                                          | ) |                            |
| ALBERTO GONZALES, ATTORNEY GENERAL,      | ) |                            |
|                                          | ) |                            |
| Respondent.                              | ) |                            |
|                                          | ) |                            |
| _____     | ) |                            |

BEFORE: MOORE and SUTTON, Circuit Judges; and KATZ, District Judge.[*]

**PER CURIAM.** Petitioner Farid Hamid Assi is a native and citizen of Lebanon. He seeks review of a Board of Immigration Appeals ("the BIA" or "the Board") decision dismissing his appeal of an order in which the Immigration Judge ("IJ") denied his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The BIA found Petitioner's asylum application untimely and his claims for withholding of removal and CAT protection incredible. For the following reasons, this Court denies the petition for review.

---

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

## I. Factual Background

Petitioner entered the United States on November 8, 2000, after flying from Damascus, Syria, to France, to Atlanta, Georgia, where he presented no valid entry document. At the airport, the Immigration and Naturalization Service (since renamed, but referred to herein as the "INS") asked him several questions, under oath, relating to his request for admission to the United States, including from what he sought protection. Petitioner said he wanted to enter the country for "safety and protection," particularly "emotional protection," from Hezbollah, because he was "being followed or gone after by them," and his "emotions [were] not very well." (JA 203).

On December 7, 2000, the INS began removal proceedings by issuing Petitioner a Notice to Appear. At the same time, it conducted a Credible Fear Interview, at which Petitioner claimed Hezbollah picked him up sixteen times between February and October of 2000, taking him from his workplace or his house, blindfolded, to a secret location, where they interrogated and beat him. Petitioner claimed Hezbollah accused him of "[c]arrying information from where I live and carrying information to Israel," (JA 243), and wanted him to enlist and participate in a jihad.

On June 11, 2001, Petitioner's counsel first entered an appearance. On July 6, 2001, Petitioner moved to change venue to Detroit, Michigan. In his motion, which was granted, Petitioner conceded his removability and said he intended to file an application for asylum. At his initial removal hearing on March 19, 2002, in Detroit, he conceded that he had not yet done so, and told the IJ he might need time to retain cheaper counsel. Though it was already more than one year since Petitioner entered the country, the IJ continued the hearing to give Petitioner time to file an asylum application and to find new counsel if he wished. (Petitioner retained his original counsel

throughout his administrative proceedings.)

On April 23, 2002, Petitioner had a second removal hearing before the IJ, at which he filed an asylum application, about eighteen months after he entered the United States. His counsel conceded the application was out of time, but suggested that might be the court's fault, for not holding a hearing until March of 2002. The IJ reminded Petitioner's counsel that applications may be filed by mail, and scheduled a merits hearing.

On March 6, 2004, Petitioner's girlfriend, with whom he had begun a relationship while still in Lebanon, and who was in the United States on a business visa, gave birth to their son in Detroit. On May 13, 2004, the couple married.

On June 2, 2004, Petitioner received a merits hearing before the IJ, at which Petitioner, his wife, and his friend testified, and at which he presented letters from his father and the mayor of his hometown in Lebanon, and a police complaint his father filed in Lebanon in 2003. Petitioner testified that, in Lebanon, he lived with his parents and siblings in a Beirut suburb where Hezbollah had a strong presence and most of the people were Hezbollah followers. He worked as a cook at a restaurant called Uncle Sam, near the American University. His girlfriend, a student at the university, lived in Beirut.

Petitioner claimed that in February, 2000, Hezbollah started causing him problems, which he first described as, "[t]hey would arrest me from my job, place or my home and they would take me to (Indiscernible) belong to them and they would tie my eyes before I reached . . . the place . . . ." (JA 78). Hezbollah asked him about certain people they were seeking who had come to Petitioner's restaurant, and asked him to work with them and to be ready to fight for them. He testified that

3

when he refused to answer their questions and refused to join their cause:

> [T]hey used to punch me in the face and they would use the gun also, the back of the gun and they would beat me in the shoulders . . . and even they hit my eye at one time. Blood came from my nose and I used to feel that pain, really very painful, especially these beatings with the back of the gun in my cheeks and I, I didn't have the courage to tell anybody, because they would threaten me that if you tell anybody that we will get rid of you in a way that nobody will know about it.

(JA 80). At the hearing, he said Hezbollah accused him of "giving information to people that work for Israel, that is the army of [General Antoine] Lahad and as such, therefore, I am also a spy." (JA 97).

Petitioner said Hezbollah arrested him sixteen times, nine from his home and seven from his workplace, detaining him for twelve to twenty-four hours at a time, and that "[a]ll of it was interrogations and questions, physical punishment as well as emotional punishment," (JA 81). Finally, Petitioner fled Lebanon. He claims his last arrest was on October 7, 2000.

On cross-examination, Petitioner said he would go to his home or work place after the interrogations and beatings, but that he did not tell his parents what happened to him until he was safely in the United States. Counsel asked Petitioner whether his parents wouldn't have been able to notice his injuries, and Petitioner then testified that "[s]ometimes they [his parents] would [notice, but] not all the time they [Hezbollah] were hitting me. Sometimes they would hit me or they would slap me, more of an emotional crisis with them sometimes . . . ." (JA 89). When asked whether he ever sought medical attention, Petitioner asked, "You mean a psychological?" *Id.* He then explained that when his parents asked about his injuries, he told them he "had a problem with somebody or some incident happened to me." (JA 90).

4

Petitioner also testified that he only told his girlfriend that Hezbollah was arresting him "at the end" (JA 90), but that one time before he told her she saw him being arrested from his workplace on his birthday, April 3rd. When counsel asked Petitioner whether his employer would have known that Hezbollah came and arrested him from his workplace, Petitioner said, "[t]hey, they would not come and arrest me in front of everybody and they would not arrest me in front of everybody, but somebody would come to me as if he's buying from me and then would tell me that there's a car waiting for you there." (JA 90-91). Likewise, when asked why his family had not provided a statement saying they had seen Petitioner arrested from his home, Petitioner said, "[t]hey, they wouldn't take me from, from inside the house while I'm (indiscernible), maybe outside they would tell me that tomorrow we will come. We will take you from the such and such place. Be there." (JA 98-99).

Petitioner's wife had been sequestered while Petitioner testified. When she took the stand, counsel asked whether the arrest that she observed on Petitioner's birthday, April 3rd, was the first time she learned of his problems with Hezbollah. They had the following exchange:

Q. Now, this [the April 3rd arrest] is the first time you knew that he was having problems with Hesbula?
A. No, I've already known that he had problems earlier.
Q. How did you know that?
A. He told me about that.
Q. But his first arrest you said was in February of 2000?
A. Uh-huh.
Q. You saw him being arrested on April 3rd of 2000?
A. Yes.
Q. And he discussed how he was being apprehended or arrested by Hesbula [sic] at that time?
A. Yes.
Q. Do you know when it was that he first told you?

5

A.  I think in March, I'm not sure of the date, I believe like after one month.
Q.  And how many times had he been arrested [when he told you]?
. . . .
A.  – two to three times.

(JA 118-19).

Petitioner also presented a letter from the mayor of his town, but admitted it contained only hearsay.  Likewise, Petitioner's friend had not been in Lebanon at the critical time, and knew only things Petitioner or others had told him.  Petitioner presented a letter from his father, written in 2004, which included the report that, "circumstances are still the same as they were before you left, and you know what I mean, surveillance, and questions and tracking . . . ." (JA 236).  Finally, Petitioner presented a complaint his father made to the Lebanese police in January, 2003, stating that "unknown individuals" came to his house and threatened to kill Petitioner if he was found.  (JA 231).

The IJ denied Petitioner's application for asylum, withholding of removal, and protection under the CAT.  The IJ found the asylum application untimely, and in any event, frivolous.  The IJ further found, based on contradictions in the testimony and lack of corroboration, that Petitioner had fabricated his tale of being arrested and beaten sixteen times by Hezbollah.  He therefore concluded that Petitioner lacked credibility and that there was no basis for withholding of removal or CAT relief.

On October 24, 2005, the BIA dismissed Petitioner's appeal, agreeing that his asylum application, filed more than eighteen months after he entered the country, was untimely, and that no exception applied.  The BIA then reviewed the IJ's credibility determination under the "clearly

6

erroneous" standard, per 8 C.F.R. § 1003.1(d)(3). The BIA found that several of the inconsistencies the IJ relied upon to find Petitioner incredible either did not go to the heart of Petitioner's claims, were not supported by the record, or were based on speculation and conjecture. However, the BIA also found that those inconsistencies that the record *did* support *did* go to the heart of Petitioner's claim, and cast doubt on the veracity of his story. Finding that Petitioner failed to explain most of the inconsistencies and failed to corroborate his tale, despite reasonable opportunities to do so, the BIA upheld the IJ's adverse credibility determination as not clearly erroneous. Finally, the BIA reversed the IJ's finding that Petitioner's asylum application was frivolous, because the record contained insufficient evidence that Petitioner deliberately fabricated a material element of the application.

Petitioner now asks this Court to review the BIA's order. Though his petition broadly seeks review of the Board's entire order, Petitioner's brief ostensibly presents only one issue: whether the BIA abused its discretion and violated Petitioner's due process rights when it used the "clearly erroneous" standard, rather than a "de novo" standard, to review the IJ's credibility determination. Petitioner claims the BIA should have undertaken a de novo review of the IJ's findings once it determined that some but not all of the IJ's conclusions resulted from speculation and were based on facts not supported by the record. He claims the Board's failure to do so amounts to a denial of due process. The Government believes there are three issues before this Court: whether this Court has jurisdiction to review the timeliness of Petitioner's asylum application; whether the BIA's adverse credibility finding was supported by substantial evidence; and whether the Board's failure to review de novo violated the Due Process Clause. Because Petitioner seeks review of the BIA's

7

entire order and argues the merits of the credibility issue in the body of his brief ("the BIA erred in its determination that material inconsistencies exist in the record sufficient to support an adverse credibility determination," (Pet. Br. 9)), the Court addresses all three issues.

## II. Asylum: Timeliness and Jurisdiction

An applicant must file for asylum within one year after entering the United States, unless he can demonstrate changed or extraordinary circumstances. 8 U.S.C. § 1158(a)(2)(B), (D). The BIA found Petitioner's asylum application untimely because he filed it eighteen months after entering the country and because he did not qualify for any exception. This Court may review the denial of an asylum application for untimeliness where the appeal seeks review of constitutional claims or matters of statutory construction, but it lacks jurisdiction to do so where the appeal seeks review of discretionary or factual questions. *Almuhtaseb v. Gonzales*, 453 F.3d 743 (6th Cir. 2006). Petitioner's case falls into the latter category: the IJ and the Board denied his application because eighteen months elapsed before he filed it, and because it did not cite any changed or extraordinary circumstances. Therefore, this Court may not review the denial of Petitioner's asylum application as untimely.

## III. Withholding of Removal and CAT: Petitioner's Credibility

"An alien seeking withholding of removal must demonstrate 'that there is a clear probability that he will be subject to persecution if forced to return to the country of removal.'" *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004)). To receive protection under the CAT, an alien must show it is "more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

Petitioner's claims for withholding of removal and protection under the CAT are based on his assertion that he was arrested, interrogated, and beaten sixteen times by Hezbollah. Because the IJ determined Petitioner's story was not credible, Petitioner could not meet his burdens.

Because the credibility determination is a "finding of fact," the Court reviews under the substantial evidence standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). The BIA's factual determination is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). This Court may not reverse simply because it would have ruled differently. *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992). "Rather, in order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it." *Id*. at 152. The Board's adverse credibility finding must be "supported by specific reasons" and "based on issues that go to the heart of the applicant's claim." *Sylla*, 388 F.3d at 926. The cited discrepancies must be "viewed as attempts by the applicant to enhance his claims of persecution. . . ." *Id*. (internal quotations omitted).

The IJ found Petitioner's story incredible due to several inconsistencies in the testimony and the record. However, the BIA found that some of those cited inconsistencies were either not supported by the record, did not go to the heart of Petitioner's claim, or were based on speculation, so it discounted them. But, the Board found that four of the inconsistencies the IJ cited *were* supported by the record and *did* go to the heart of Petitioner's claim, thereby justifying the adverse credibility finding.

First, Petitioner's testimony about when he told his wife (who was his girlfriend at the time) about the arrests and beatings conflicted with his wife's statement. Petitioner claims Hezbollah first

9

arrested him in February of 2000, and that the last arrest was in October of that year. At the hearing, Petitioner said he only told his girlfriend that Hezbollah had been arresting and beating him "at the end," and that the time when she saw him arrested on his birthday in April was "before that." However, when counsel asked Petitioner's wife whether the arrest on April 3rd was the first time she learned of his problems with Hezbollah, she said that it was not, that Petitioner first told her in March, after he had been arrested only two or three times. The IJ considered this contradiction evidence that the two could not keep their story straight, indicating it was made up. He said Petitioner's wife "completely torpedoed his claim and demonstrated beyond any doubt that [Petitioner] lied about his whole claim and . . . that he made up the important, most material aspect of his claim, that is that Hizballah had arrested him and had beaten him and tortured him on 16 different occasions." (JA 33-34).

Second, Petitioner's statements about where Hezbollah arrested him were internally inconsistent. In his credible fear interview, Petitioner testified that Hezbollah "would come to [his] work and sometimes they would come to [his] house and pick [him] up." (JA 212). Additionally, at his merits heating, Petitioner first testified that "[t]hey would arrest me from my job, place or my home . . . ." (JA 78). However, when asked why his employer had not observed this, Petitioner backpedaled, stating, "[t]hey, they would not come and arrest me in front of everybody . . . but somebody would come to me as if he's buying from me and then would tell me that there's a car waiting for you there." (JA 90-91). Likewise, when asked why his family never observed him being arrested from his home, Petitioner replied that "[t]hey, they wouldn't take me from, from inside the house while I'm (indiscernible), maybe outside they would tell me that tomorrow we will come. We

10

will take you from the such and such place. Be there." (JA 98-99). The IJ found the contradiction between Petitioner's early descriptions of his problems with Hezbollah ("they would come to my house and pick me up") to be inconsistent with his later descriptions ("maybe outside they would tell me that tomorrow we will . . . take you from the such and such place"), which only surfaced once Petitioner was asked why no one witnessed his sixteen arrests, adversely reflected on his credibility.

Third, Petitioner's statement upon arrival at the Atlanta airport conflicted with his later testimony about what Hezbollah had done to him. At the airport, when asked from what he sought protection, Petitioner said only that he was being "followed or gone after" by Hezbollah, and that he sought "emotional protection more than other protection." (JA 203). At the merits hearing, he testified that he told the immigration officer at the airport "all the truth exactly like my story had happened." (JA 82). Yet that story omitted any reference to arrests and beatings. Though Petitioner claims they did not ask him about arrests, the immigration officer asked from what Petitioner sought protection, but he did not mention what later became his main claim for asylum and withholding of removal.

Fourth, Petitioner's descriptions of Hezbollah's accusations changed over time. At his credible fear interview, Petitioner said Hezbollah accused him of "carrying information from where [he] live[d] and carrying information to Israel." (JA 211). However, he later testified that Hezbollah said he was "giving information to people that work for Israel, that is the army of [General Antoine] Lahad and as such, therefore, I am also a spy." (JA 97). The IJ found that the change in Petitioner's story from being accused to carrying information to Israel to giving information to Israeli agents was inconsistent and therefore unreliable.

11

The BIA also cited Petitioner's failure to provide reasonable explanations for these contradictions and to corroborate his story with reliable evidence, despite the opportunity to do so. For example, Petitioner presented a letter from his father that was dated well after Petitioner claims he told his father the whole story, yet the letter does not mention arrests or beatings. Rather, it says "circumstances are still the same as they were before you left, and you know what I mean, surveillance, and questions and tracking . . . ." (JA 236). The IJ found that Petitioner's failure to secure a letter from his father mentioning the arrests and beatings, or that his father had observed Petitioner's injuries after the arrests, when Petitioner obviously had the opportunity to do so, reflected poorly on Petitioner's credibility. The IJ noted that Petitioner's father's 2003 police complaint did not mention Hezbollah or that Petitioner had been arrested and beaten. Petitioner's friend's testimony and the letter from the mayor of his hometown contained only hearsay, and provided no reliable corroboration. Based on the preceding, the Board found the IJ's adverse credibility determination not clearly erroneous.

The BIA supported its adverse credibility finding with the specific reasons set forth above, and the Court agrees that the cited inconsistencies go to the heart of the matter: whether Petitioner was in fact arrested and beaten sixteen times by Hezbollah. The record supports the findings that Petitioner's story conflicted with that told by his wife, and evolved over time in the face of specific questions, developing internal inconsistencies about where Hezbollah took him from and of what they accused him. Petitioner omitted from his airport statement not merely certain details of his larger story, but rather the central events supporting his later applications for asylum and withholding of removal. These discrepancies may be "viewed as attempts by the applicant to

12

enhance his claims of persecution." On this record, the evidence does not compel the conclusion that Petitioner testified credibly. The Court affirms the Board's adverse credibility determination.

## IV. Due Process

Petitioner claims the BIA abused its discretion and violated his due process rights when it reviewed the IJ's findings of fact for clear error, despite its finding that the IJ made several mistakes. The applicable regulation requires the BIA to review findings of fact, including credibility determinations, for clear error, and expressly forbids the BIA from conducting a de novo review of the IJ's factual determinations. 8 C.F.R. § 1003.1(d)(3) ("The Board will not engage in de novo review of findings of fact determined by an immigration judge."). However, Petitioner believes that once the BIA discovered the IJ's errors, it should have reviewed the IJ's findings of fact de novo, and that the Board's adherence to the regulation in this particular situation violated the Constitution. Petitioner is incorrect: the BIA did not abuse its discretion or violate the Due Process Clause by applying the "clearly erroneous" standard of review.

The Supreme Court has approved the "clearly erroneous" standard for appellate review of trial-court fact-finding in both the civil and criminal contexts. *Anderson v. Bessemer City, North Carolina*, 470 U.S. 564, 573-75 (1985); *Maine v. Taylor*, 477 U.S. 131, 145 (1986). Yet, the Due Process Clause has not driven the Court to create an exception for those inevitable instances when the reviewing court discovers that some of the fact-finder's conclusions were erroneous. *See Anderson*, 470 U.S. at 573-75; *Taylor*, 477 U.S. at 145. It is intrinsic in appellate review that in some cases, errors will be found. Neither logic nor any authority supports the position that due

process requires the standard of review to change when errors are discovered. The "clearly erroneous" standard is the lens through which the BIA is to view the IJ's findings of fact, as it did in this case, carefully distinguishing those conclusions that passed muster from those that did not. In the end, the BIA found that the record supported enough of the IJ's findings that the adverse credibility determination was not clearly erroneous. The BIA did not abuse its discretion and did not violate the Due Process Clause in so doing.

## V. Conclusion

For the reasons stated above, this Court DENIES the petition for review.