HAZARDOUS WASTE TREATMENT COUNCIL, on behalf of itself and its members, Plaintiff,

v.

STATE OF SOUTH CAROLINA, John T. Campbell, Secretary of State, Carroll A. Campbell, Jr., Governor, in his official Capacity, Commissioner, South Carolina Department of Health and Environmental Control, in his official capacity, and South Carolina Department of Health and Environmental Control, Defendants.

Civ. A. No. 3:90–1402–0.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 11, 1991.

Jeter E. Rhodes, Jr., Whaley, McCutchen, Blanton & Rhode, Columbia, S.C., Stuart H. Newberger, Crowell & Moring, David E. Case, Washington, D.C., for plaintiff.

T. Travis Medlock, Atty. Gen., Edwin E. Evans, Chief Deputy Atty. Gen., James Patrick Hudson, Deputy Atty. Gen., Kenneth P. Woodington, Sr. Asst. Atty. Gen., Columbia, S.C., Charles F. Lettow, Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for State of S.C.

Treva G. Ashworth, Sr. Asst. Atty. Gen., Mark R. Elam, Sr. Legal Counsel, Columbia, S.C., for Carroll A. Campbell, Jr.

Walton J. McLeod, III, Gen. Counsel, Jacquelyn S. Dickman, Asst. Gen. Counsel, Samuel L. Finklea, Staff Counsel, Columbia, S.C., for Com'r of South Carolina Dept. of Health & Environmental Control and South Carolina Dept. of Health and Environmental Control, South Carolina Bd. of Health and Environ. Control.

James E. Chandler, Jr., Pawleys Island, S.C., for proposed intervenors Sierra Club and Energy Research.

Robert Guild, Columbia, S.C., for Citizens for Clean Air and Water and Environmentals, Inc.

## MEMORANDUM AND ORDER

PERRY, District Judge.

The plaintiff Hazardous Waste Treatment Council, a corporate trade association with approximately seventy member firms providing licensed services of treatment, recycling and disposal of hazardous wastes, commenced this action against the defendants State of South Carolina, its Governor, the South Carolina Department of Health and Environmental Control (DHEC) its Commissioner and its Board for declaratory and injunctive relief, prohibiting implementation of certain restrictions which defendants have placed upon treatment and disposal, in South Carolina facilities, of hazardous wastes generated in other states. The matter is now before the Court pursuant to the plaintiff's motion for a preliminary injunction, barring enforcement of the restrictions.

In its complaint the plaintiff challenges South Carolina's announced purpose, set forth in its statutes, regulations and Executive Orders to (1) prohibit passage and disposition into South Carolina facilities, hazardous wastes generated in states which have not provided within their borders facilities for the disposal of hazardous wastes; (2) impose discriminatory quotas upon the quantities of such wastes otherwise permitted; and (3) create a mandatory preference for wastes generated in South Carolina. Specifically, plaintiff contends that South Carolina's statutes, Executive Orders and regulations:

(1) prohibit plaintiff's member companies located in South Carolina from accepting any hazardous wastes generated outside the State *unless* the state of origin reciprocates and is free of bans on permitting hazardous waste treatment, storage and disposal within its borders—a blacklisting of generators from certain states, barring them from engaging in commerce within South Carolina;

(2) require plaintiff's member companies located in South Carolina to provide a "preference" in their operations for hazardous wastes within South Carolina over any such wastes generated outside this State—a preferred "right of access" which discriminates against generators from all other states;

(3) impose artificial, arbitrary and discriminatory quotas on the volume of hazardous wastes which may be disposed within this State by limiting disposal of wastes originating from other states; and

(4) impose artificial and discriminatory requirements for the permitting of any new or expanded hazardous waste management facility proposed within South Carolina—requiring a "demonstration of in-state need" regarding hazardous waste treatment, storage and disposal in the permit applications from including projections of wastes generated from any other states as a basis for their statement of "need." Memorandum of Points and Authorities in Support of Motion for Preliminary Injunc-

tion, pp. 2, 3. Plaintiff contends that these laws (1) discriminate against the free flow of interstate commerce—a violation of the Commerce Clause (U.S. Const. art. 1, § 8 cls. (3) and (2) conflict with and are preempted by the federal hazardous waste management regulatory program—a violation of the Supremacy Clause (U.S. Const. art. VI, cl. 2) and federal regulations prohibiting such laws (40 C.F.R. § 271.4).

Plaintiff asserts that on account of the challenged South Carolina laws, its members are unable to participate fully in the important business of national waste management and that they are losing business revenues for which they lack any remedy at law. Plaintiff argues also that because these laws are adverse to the public interest—i.e. the free movement of hazardous wastes between all states for safe and effective treatment and disposal—this Court should issue a preliminary injunction.

Defendants deny that their statutory laws, executive orders and regulations violate the Constitution as alleged. Defendants assert that "[t]he South Carolina program represents a fully permissible response to the federal mandate; that the State has formulated its own Hazardous Waste Management Program which has been approved by the Environmental Protection Agency (EPA); that the State has submitted and gained federal approval of a Capacity Assurance Plan ("CAP") for managing hazardous wastes generated within the State over the next twenty years and thus has preserved its right to remedial-action Superfund monies supplied by EPA; and the State has entered into a regional agreement that coordinates and provides for the needs of both in-state and out-of-state generators of hazardous waste." DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, p. 3. Defendants also argue that, because federal law requires that South Carolina ensure that it can provide for the treatment and disposal of all hazardous wastes generated in the State in the next twenty years, South Carolina must consider separately—

and fashion an allocation between both in-state and out-of-state generators—which has been expressly commanded and thus sanctioned by Congress and that, moreover, South Carolina's particular CAP (including provisions at issue here) has been approved by EPA. *Id.*

### BACKGROUND

The national problem of hazardous waste management has been addressed through a comprehensive Federal regulatory program administered by the United States Environmental Protection Agency (EPA) in cooperation with the states. In addition to Resource Conservation and Recovery Act ("RCRA"), Congress has enacted the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the "Superfund" statute.[1] While RCRA addressed the management aspects of solid wastes, CERCLA addresses primarily the clean-up of untreated hazardous waste disposal sites. In 1980, exercising its authority under these statutes, EPA issued extensive regulations regarding implementation of state hazardous waste management programs. Thereafter, as a part of this nationwide program, EPA delegated to South Carolina certain authority to regulate hazardous waste management within the state, *See* 50 Fed.Reg. 46437 (November 8, 1985).

Despite congressional efforts, many states ignored the CERCLA capacity assurance requirement and refused to permit any new treatment, storage, and disposal facilities. In their brief (p. 5) the defendants state that although most states were in agreement that the hazardous waste problem was a threat to the entire nation, many states and localities succumbed to the "not in my backyard" ("NIMBY") syndrome with the resultant effect that most hazardous waste continued to be shipped to the scarce existing facilities in a few select states.

Congress responded with the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). SARA undertook to ad-

---

1. 42 U.S.C. §§ 9601–9675 (1982 & Supp. IV 1986).

dress the NIMBY problem by requiring states to provide additional assurance of adequate future capacity to treat and dispose of hazardous waste as a condition to the funding of Superfund site cleanups in the states. As added by SARA, section 104(c)(9) of CERCLA provides:

**(9) Siting**

Effective 3 years after October 17, 1986, the President shall not provide any remedial actions pursuant to this section unless the state in which the release occurs first enters into a contract or cooperative agreement with the President providing assurances deemed adequate by the President that the State will assure the availability of hazardous waste treatment or disposal facilities which—

(A) have adequate capacity for the destruction, treatment or secure disposition of all hazardous wastes that are reasonably expected to be generated within the State during the 20–year period following the date of such contract or cooperative agreement and to be disposed of, treated, or, destroyed,

(B) are within the State or outside the State in accordance with an interstate agreement or regional agreement or authority,

(C) are acceptable to the President, and

(D) are in compliance with the requirements of subtitle C of the Solid Waste Disposal Act [42 U.S.C.A. § 6921 *et seq.*].

42 U.S.C. § 9604(c)(9).

As previously noted, RCRA envisaged that administrative and enforcement activities would primarily be performed by the states. To meet this end, RCRA § 3006(b) provides that states may apply to EPA for authorization to implement a hazardous waste treatment program "in lieu of the Federal program." *See* 42 U.S.C. § 6926(b). EPA's regulations implementing the statutory requirements for authorization of state programs are set forth in 40 C.F.R. Part 271 (1989). Entitled "REQUIREMENTS FOR AUTHORIZATION OF STATE HAZARDOUS WASTE PROGRAMS," Part 271 "specifies the proce-

dures EPA will follow in approving, revising, and withdrawing approval of State programs and the requirements State programs must meet to be approved by the Administrator under section 3006(b) and (f) of RCRA." 40 C.F.R. § 271.1(a).

In essence, RCRA § 3006 provides that EPA must authorize a state program unless it is found to be less stringent than the federal program outlined in RCRA, inconsistent with RCRA provisions or regulations, or simply inadequate in terms of its enforcement provisions. In implementing Section 3006, EPA provided:

**§ 271.4 Consistency.**

To obtain approval, a State program must be consistent with the Federal program and State programs applicable in other States and in particular must comply with the provisions below. For purposes of this section the phrase "State programs applicable in other States" refers only to those State hazardous waste programs which have received final authorization under this part.

(a) Any aspect of the State program which unreasonably restricts, impedes, or operates as a ban on the free movement across the State border of hazardous wastes from or to another State for treatment, storage, or disposal at facilities authorized to operate under the Federal or an approved State program shall be deemed inconsistent.

(b) Any aspect of State law or of the State program which has no basis in human health or environmental protection and which acts as a prohibition on the treatment, storage or disposal of hazardous waste in the State may be deemed inconsistent.

(c) If the State manifest system does not meet the requirements of this part, the State program shall be deemed inconsistent.

40 C.F.R. § 271.4, Part 271 also contains detailed provisions which specify the criteria and procedures for withdrawing approval of state programs, including citizen petitions to EPA for withdrawal and for participation in withdrawal proceedings. *See* 40 C.F.R. § 271.22 and § 271.23.

### The National Problem of Hazardous Waste Management

Recognizing the need for a hazardous waste management program that is "national in scope and concern," Congress enacted the Resource Conservation and Recovery Act (RCRA) in 1976. 42 U.S.C. § 6901(a)(4). This national program encourages states to cooperate with EPA and their sister states regarding the entire hazardous waste management field. While EPA retains authority to administer the national program, participating states may implement their own waste management programs so long as they are "equivalent" and "consistent" with EPA regulations. RCRA § 3006(b), 42 U.S.C. § 6926(b).

To determine whether an approved state hazardous waste management program is "consistent with" the Federal regulatory scheme, EPA issued regulations setting forth specific criteria. *See* 40 C.F.R. § 271. These regulations emphasize that "Congress intended (through enactment of RCRA) for State programs receiving final (EPA) authorization to become fully part of an integrated national program to control hazardous waste." 45 Fed.Reg. 3393 (May 19, 1980). Critical to the success of this "national program" is that "the interstate commerce concerns involved here are emphasized by the establishment through RCRA of a national regulatory scheme, even though that scheme is not on its face preemptive (of State programs)." *Id.*

Consistent with the national approach to the hazardous waste management field, Congress enacted certain amendments to RCRA through passage of the Hazardous and Solid Waste Amendments ("HSWA") Pub.L. No. 98–616. These amendments emphasized further the scope of the national problem and the need to employ state-of-the-art hazardous waste management technology across the country. Consequently, these amendments established national land disposal restrictions which require that hazardous wastes be treated by using the "best demonstrated available technology" before the waste can be land-disposed. *See* 42 U.S.C. § 6924(d)–(m).[2]

### Hazardous Waste Management in South Carolina

There are three facilities located in South Carolina—all operated by plaintiff's members—licensed under federal and state law to treat, store or dispose of hazardous wastes. The largest facility, owned and operated by Laidlaw Environmental Services, Inc. (formerly GSX Chemical Services, Inc.) in Pinewood, South Carolina, consists primarily of secure, engineered landfill permitted by EPA on an interim basis in 1980 and fully permitted by both EPA and the South Carolina Department of Health and Environmental Control (DHEC) in 1989.[3] The two other facilities both operate waste incinerators. One (a rotary kiln incinerator) is owned by a Laidlaw subsidiary, Thermal Oxidation Corporation in Roebuck, South Carolina.[4] The other (an open hearth incinerator) is owned by ThermalKEM, Inc. and is located in Rock Hill, South Carolina.[5]

From their inception, all three facilities have accepted hazardous wastes generated from outside South Carolina. Because of

---

**2.** Plaintiff argues that Congress enacted the HSWA land disposal amendments directly because plaintiff's members could provide the most advanced and effective waste management technologies and services.

**3.** *See* Affidavit of Roger E. Davis at ¶¶ 5, & 7. Landfills such as Laidlaw's must be constructed with dual synthetic liners beneath the waste, leachate collection systems to remove liquids, leak detection systems, and a groundwater monitoring system. There are only a limited number of major commercial landfills authorized for hazardous waste disposal in the United States and, like Laidlaw, all serve customers on a national basis. Fortuna Affidavit at ¶ 7.

**4.** Davis Affidavit at ¶ 4.

**5.** Recognized by EPA as the "Best demonstrated achievable technology" for many hazardous wastes, incineration reduces the volume of waste by 70 percent, and is capable of treating 85 percent of the hazardous waste generated in the United States. Affidavit of William J. Ziegler at ¶¶ 6 and 9. A licensed incinerator must consistently destroy at least 99.99 percent of the principal hazardous constituents in the processed wastes. Ziegler Affidavit at ¶ 7; Fortuna Affidavit at ¶ 1.

the specialized skills and complex technology required to meet federal and state regulations, there are a limited number of commercial facilities in the country that can safely and effectively treat and dispose of hazardous wastes. Fortuna Affidavit at ¶ 7.

Therefore, these three South Carolina facilities have historically served out-of-state generators of hazardous wastes.[6] At the same time these facilities conduct a substantial volume of business with generators located within South Carolina. Ziegler Affidavit at ¶ 15. Davis Affidavit.

Additionally, many of plaintiff's members located outside South Carolina conduct business with facilities in South Carolina.[7] Some of these out-of-state facilities receive hazardous wastes generated by and shipped from South Carolina companies.[8] Plaintiff argues that the availability of an environmentally secure engineered, licensed disposal facility in South Carolina ensures that its out-of-state members—several of whom are engaged in Superfund cleanup activities—will dispose of their wastes in an environmentally safe manner and that any disruption in the availability or capacity of the three South Carolina facilities interferes significantly with the ability of plaintiff's out-of-state members to conduct their business.[9]

*The Challenged South Carolina Laws, Executive Orders and Regulations*

Beginning in 1988 South Carolina enacted the first of a series of laws restricting and prohibiting the importation of hazardous wastes generated in other states.

1. In 1988 DHEC began conditioning the issuance of permits for any new or expanded facility upon the needs of "in-state" generators. DHEC submitted permanent regulations containing this requirement to the South Carolina General Assembly in February 1989. The regulation (DHEC Reg. 61–99) was approved (through expiration of a statutory waiting period) on January 12, 1990.[10] Davis Affidavit at ¶ 25. The permit regulation requires an applicant to demonstrate "in-state need" for issuance of a permit regarding any new facility or expansion of an existing facility. Reg. 61–99. Before a permit may issue, an applicant must document:

(1) the remaining available capacity at other existing facilities within South Carolina;

(2) the current volume of wastes generated within the State which will require off site management and an annual projection of such volume for each of the next five years—the "in-state" need; and

(3) the existence of additional available capacity outside South Carolina which may serve to project in-state need.

DHEC Reg. 61–99 III(C).

The permit regulations mandate that "for purposes of demonstrating need, hazardous waste generated outside the State of South Carolina shall not be included."[11] DHEC Reg. 61–99 III(C).

2. The Blacklisting Laws. On January 19, 1989 Governor Campbell issued Executive Order 89–03 which banned South Carolina from accepting any waste originating from certain states. Executive Order 89–03 provided that effective March 1, 1989:

No person who owns or operates a disposal facility in this State shall accept a hazardous waste which is generated in another State and is banned or prohibited

---

6. Affidavits of Jerry P. Deakle (at ¶ 3), Phil Fuller (at ¶ 3), James L. Chocklett (at ¶ 3), Tim Mitchell (at ¶ 3), and Samir Coluche (at ¶¶ 3 and 4).

7. Mossholder Affidavit at ¶ 2; Robertson Affidavit at ¶ 2.

8. *See* Robertson Affidavit at ¶ 4.

9. Mossholder Affidavit at ¶¶ 3, 5; Robertson Affidavit at ¶¶ 3, 4.

10. In the interim, DHEC promulgated several emergency measures to prevent issuance of any facility permit until the permanent regulations were approved. *See* Ziegler Affidavit at ¶¶ 31–32.

11. Plaintiff argues that as these regulations deny the relevance of national needs, and that they are interfering with the national program designed to safely and efficiently manage the ever growing national program.

for disposal by any statute, regulation or administrative decision of the State.

Executive Order No. 89–03 at 4. The Executive Order was extended and amended by Executive Order 89–17 which was issued on April 3, 1989. In June 1989, by passage of Act No. 196 of 1989 the South Carolina General Assembly enacted it into law.[12]

South Carolina sent copies of its laws to the environmental quality directors of all its sister states and sought immediate certification that their state did not ban the treatment of hazardous wastes within its borders. Davis Affidavit at ¶ 9. Thereafter, the first blacklist was published on March 3, 1989, listing nearly half the states in the nation. *See* DHEC, Status of Governor Campbell's Executive Order No. 89–03 (March 3, 1989).

Plaintiff argues that the blacklisting laws have caused its South Carolina members facilities to lose customers in states that are currently blacklisted.[13]

### The Preference Requirement for South Carolina Generated Wastes

The same laws which blacklisted nonconforming states also establish an additional obstacle to treatment and disposal of out-of-state generated wastes. Executive Order 89–03, its successor Executive Order 89–17 and Act No. 196 provided:

All hazardous waste treatment and disposal facilities in South Carolina shall give preference to hazardous waste generators within the State of South Carolina for treatment and disposal of hazardous materials at licensed facilities within the State.

The preference requirement has the express purpose of restricting the amount of out-of-state generated wastes that are treated and disposed of in South Carolina.

### The Discriminatory Quotas of Out-of-State Wastes

On July 6, 1989 Governor Campbell issued Executive Order No. 89–25. Executive Order 89–25 allocates the portion of the overall statutory quota that may be applied to out-of-state generators:

Hazardous waste disposal facilities operating in South Carolina shall reserve 54,-000 tons per year of the statutory maximum of 135,000 tons per year for South Carolina generated hazardous waste; provided further that of the remaining 81,000 tons, a hazardous waste disposal facility may not receive more than 10,000 tons from any state in any calendar quarter, not to exceed the annual cap of 35,-000 tons.

Executive Order 89–25 also includes a clause which enables a "sharing of excess in-state capacity" at the end of a calendar year.[14] However, this provision is also contingent upon a preference for South Carolina wastes:

In reviewing such demonstrations (for available excess capacity) the Department is hereby directed to consider past utilization of the site and anticipated South Carolina needs, including but not limited to waste generated from state and Federal Superfund cleanup activities.

Executive Order No. 89–25 at 4.

On June 13, 1990 Governor Campbell signed into law H. 3169 (R. 729) amending the statutory quota, adding S.C.Code Ann. § 44–56–59 and amending S.C.Code Ann. § 44–56–60. This new amendment has the following effect:

(1) it reduces the annual quota on all out-of-state generated waste from 135,000 to 120,000;

---

**12.** The statute provides:
It is unlawful for any person who owns or operates a waste treatment facility within this State to accept any hazardous waste generated in any jurisdiction which prohibits by law the treatment of that hazardous waste within that jurisdiction or which has not entered into an interstate or regional agreement for the safe treatment of hazardous waste.
S.C.Code Ann. § 44–56–130(4).

**13.** Davis Affidavit at ¶¶ 17–18.

**14.** If after the third quarter of any calendar year, and upon demonstration to DHEC that the capacity reserved for South Carolina generators will not be required in the remainder of the year, the excess capacity may be offered to non South Carolina generators. Executive Order 89–25 at 4.

(2) when combined with the capacity restrictions imposed by Executive Order 89–25, it reduces the annual portion allocated for out-of-state wastes to a maximum of 66,000 tons (55% of total capacity) this year and to 56,000 tons (51% of that capacity) in July 1991 when a 110,000 ton quota takes effect;

(3) it allows land disposal in excess of the annual 120,000 ton quota only if (a) the excess waste is from a South Carolina site or (b) at least 110,000 tons of South Carolina waste has been disposed of by land burial in this state during the year;

(4) it lowers the annual quota even further by limiting generators in each state to the disposal volume that all generators in their state shipped in the previous 12 months.

  *  *  *  *  *  *

Plaintiff argues that the net effect of these "protectionist" laws is that they are having the effect of interfering with the free flow of interstate commerce.

### The Commerce Clause

■ The United States Constitution gives Congress the power to regulate commerce among the States.[15] Also, the Commerce Clause of the Constitution limits the authority of a state to discriminate against interstate commerce. *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988); *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons Inc. v. Du Mond*, 336 U.S. 525, 534–35, 69 S.Ct. 657, 663–64, 93 L.Ed. 865 (1949); *Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1876). This "negative aspect" of the Commerce Clause—limiting the power of the states to regulate interstate commerce—prohibits a state from placing its parochial interests above the national interest in the free flow of interstate commerce. *New Energy*, 486 U.S. at 273–74, 108 S.Ct. at 1807–08. In-

deed, state laws which discriminate against interstate commerce are "routinely" struck down "unless the discrimination is demonstrably justified by valid factors unrelated to economic protectionism." *Id.* at 274, 108 S.Ct. at 1807 citing *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). The Supreme Court has explained the broad purpose of the Commerce Clause as follows:

> The principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in *Baldwin v. Seelig*, 294 U.S. 511, 527 [55 S.Ct. 497, 502, 79 L.Ed. 1032] 'what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation.'

*H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537–538, 69 S.Ct. 657, 664–665, 93 L.Ed. 865 (1949). The Supreme Court is alert to the evils of "economic isolation" and protectionism but has recognized that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. For example, the Supreme Court has upheld a Maine statute that prohibited the importation of a certain type of baitfish not native to Maine because the baitfish contained a parasite that would have a serious detrimental effect on Maine's fisheries. *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). And, in *Clayson v. Indiana*, 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939), the Supreme Court upheld an Indiana statute that prohibited the transportation of large dead animals into or within the state. Rejecting a contention that the statute violated the Commerce Clause, the Court observed that the obvious purpose of the enactment was to prevent the spread of disease and the development of nuisances. Such state laws

---

**15.** United States Constitution, Art. I § 8, cl. 3:

The Congress shall have power—to regulate Commerce with foreign Nations, and among the several States....

do not discriminate against interstate commerce; they "simply prevent traffic in noxious articles, whatever their origin." *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). But "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *City of Philadelphia v. State of New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). *See H.P. Hood & Sons, Inc. v. Du Mond, supra; Toomer v. Witsell*, 334 U.S. 385, 403–406, 68 S.Ct. 1156, 1165–1166, 92 L.Ed. 1460 (1948). And the clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. *Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1876).

Of binding precedential value in this case is the Supreme Court's decision striking down, on Commerce Clause grounds, New Jersey's efforts to construct a barrier to the shipment of wastes for treatment and disposal in that state. Exasperated over the mounting problems of out-of-state wastes, New Jersey enacted a statute which provided that "no person shall bring into this State solid or liquid waste which originated or was collected outside the territorial limits of the State...." *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). The Court stated that

> [I]t does not matter whether the ultimate aim of (New Jersey's protectionist law) is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of all waste into the State's remaining landfills, even though interstate commerce may be incidentally affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin to treat them differently....

*Id.* at 626–627, 98 S.Ct. at 2537. *See also National Solid Wastes Management Association, et al v. The Alabama Department of Environmental Management, et al.*, 910 F.2d 713 (11th Cir.1990) which declared unconstitutional an Alabama law prohibiting that state's commercial waste management facilities from accepting hazardous wastes generated in other states unless the other states met certain requirements.

■ The defendants argue that the challenged hazardous waste laws, Executive Orders and regulations do not conflict with the Commerce Clause of the Constitution because South Carolina's hazardous waste management program has been approved by EPA under RCRA, CERCLA and SARA and that when Congress enacted RCRA it stated its intent that each state be permitted to implement its own hazardous waste program. RCRA § 3006(b), 42 U.S.C. § 6926(b).

Defendants point to a provision preserving state authority over regulation of hazardous waste which provides that

> Upon the effective date of regulations under this subchapter no state or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations.... Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations.

RCRA § 3009, 42 U.S.C. § 6929.

Defendants cite *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 174, 105 S.Ct. 2545, 2553, 86 L.Ed.2d 112 (1985), where the Court addressed the constitutionality of certain state laws concerning interstate bank acquisitions. Under the Bank Holding Company Act of 1956, 12 U.S.C. § 1841, *et seq.*, before a bank holding company could acquire a bank, it had to obtain the approval of the Federal Reserve Board (FRB). An amendment to the Bank Hold-

ing Company Act (the Douglas Amendment) prohibited the FRB from approving an interstate acquisition unless the acquisition was "specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication." 12 U.S.C. § 1842(d). In the early 1980's several New England states enacted statutes lifting the Douglas Amendment ban, but only on a reciprocal basis within the geographic region. The state laws were challenged on Commerce Clause and other constitutional grounds. The Court found the state laws to be within the kind contemplated by the Douglas Amendment and constitutional. The Court stated that

> There can be little dispute that the dormant Commerce Clause would prohibit a group of States from establishing a system of regional banking, banking by excluding bank holding companies from outside the region if Congress had remained completely silent on the subject. *Lewis v. B.T. Investment Managers, Inc.*, 447 U.S. 27 [100 S.Ct. 2009, 64 L.Ed.2d 702] (1980). Nor can there be serious question that an individual State acting entirely on its own authority would run afoul of the dormant Commerce Clause if it sought to comprehensively regulate acquisitions of local banks by out of state holding companies. *Sporhase v. Nebraska, ex rel Douglas*, 458 U.S. 941 [102 S.Ct. 3456, 73 L.Ed.2d 1254] (1982). But that is not our case. Here the commerce power of Congress is not dormant, but has been exercised by that body when it enacted the Bank Holding Company Act and the Douglas Amendment to the Act. Congress has authorized by the later amendment the Massachusetts and Connecticut statutes which petitioners challenge as violation of the Commerce Clause. When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause.

*Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. at 174, 105 S.Ct. at 2553. The defendants argue that the South Carolina hazardous waste provisions fall within the realm "plainly authorized" by Congress and must be measured accordingly. So viewed, the defendants argue, the South Carolina hazardous waste provisions are invulnerable to constitutional attack.

■ While Congress can authorize States to erect barriers to interstate commerce, such congressional authorization must be "expressly stated" and "unmistakably clear." "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). Indeed, "Congress may redefine the distribution of power over interstate commerce in a manner which would otherwise not be permissible." *South–Central Timber Devel., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 104 S.Ct. 2237, 2240–2241, 81 L.Ed.2d 71 (1984). But such congressional intent or authorization for states to affect interstate commerce, however, must be "expressly stated" and "unmistakably clear." *Id.* at 91, 104 S.Ct. at 2242.

But nothing is contained in either statute, RCRA, CERCLA or SARA that has "expressly stated" in "unmistakably clear" language congressional authorization for South Carolina to take action in the management of its hazardous waste program that adversely affects interstate commerce. *See National Solid Wastes Management Association, et al. v. Alabama Department of Environmental Management*, 910 F.2d 713 (11th Cir.1990).

### The Standard for Interlocutory Injunctive Relief

In this Circuit, a Court's determination of whether to grant or withhold interim injunctive relief is governed by four preliminary determinations:

■ (1) the plaintiff's likelihood of success on the merits of the underlying dispute; (2) whether the plaintiff will suffer irreparable harm if interim relief is denied; (3) the harm to the defendant if an injunc-

tion is issued; and (4) the public interest. *Quince Orchard Valley Citizens Association, Inc., et al v. Hodel, et al*, 872 F.2d 75 (4th Cir.1989); *North Carolina State Ports Authority v. Dart Containerline Co. Ltd.*, 592 F.2d 749 (4th Cir.1979). The trial court must weigh each of these factors in light of the " 'flexible interplay' among all the factors considered." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, supra* at 79, *citing Blackwelder Furn. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977). "If the likelihood of success on the merits is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify the issuance of the injunction." *Id.* at 79; *State Ports Authority*, 592 F.2d at 750. "Finally, the court must balance the potential harm to the plaintiff, if relief is denied, against the potential harm to the defendant if an injunction issues. In striking this balance, a trial court must be mindful of the effect of the decision, if any, on broader concerns of public interest." *Quince Orchard Valley Citizen Ass'n v. Hodel*, 872 F.2d at 79.

■ 1. In this case, the plaintiff's likelihood of success on the merits is apparent. For more than two hundred years the Commerce Clause (U.S. Const. Art. VI, cl. 2) has ensured that the States, in dealing with each other as well as with the Federal government (1) will not engage in "economic protectionism" to the disadvantage of the free flow of interstate commerce, and (2) will not engage in activities conflicting with federal laws and policies. Each of the statutes, Executive Orders and regulations challenged by the plaintiff in this case will, if enforced by the defendants, interfere with interstate commerce. Plaintiff will likely succeed on the merits in their challenge to these actions under the Commerce Clause.[15]

2. The statutes, Executive Orders and regulations which plaintiff challenges are causing injury to the plaintiff's members. The effect of the challenged laws on plaintiff's three member facilities located within South Carolina is manifested by the loss of revenues by the manner in which they are restricted and limited in the total amount of wastes they may receive from particular states and by the requirement that they choose from among their customers who happen to be from the same state. Customers or potential customers of plaintiff's members who happen to be located within "blacklisted" states are barred from doing business with them. The "preference" requirements require plaintiff's South Carolina members' facilities to turn away long standing customers who are located outside South Carolina. The "in state need" requirement contained in the permit regulation also has injured the business interests of plaintiff's South Carolina members.

Plaintiff's members located outside South Carolina are also suffering harm. Members residing in a blacklisted state are barred from sending shipments to facilities located in South Carolina and must find alternative treatment facilities if possible.[16] Plaintiff's members residing outside South Carolina are subject to the second class status—and the increased cost and inconvenience—imposed by the challenged "preference" laws, especially those combined with the discriminatory quotas. Mossholder Affidavit at ¶ 7; Robertson Affidavit at ¶ 6.

3. It cannot be disputed that South Carolina has an interest, indeed and an overriding duty, to protect human health and the environment. It is equally clear that each of the laws here challenged seek to achieve that goal. But here the plaintiff challenges only those portions of the challenged laws whose purpose is to discriminate against out of state hazardous wastes based solely on their place of origin. Hazardous wastes generated out of state pose

---

**15.** While it is apparent that plaintiff will prevail on the merits in its challenges under the Supremacy Clause, that determination is not reached in this opinion. Instead, it will be treated, if necessary, in the final order.

**16.** *See* Cocklett Affidavit at ¶ 6; Guller Affidavit at ¶ 6; Colouche Affidavit at ¶ 7; Deakle Affidavit at ¶ 7; Mitchell Affidavit at ¶ 7.

no more threat to human health and the environment than hazardous wastes generated in South Carolina. *See Philadelphia v. New Jersey,* 437 U.S. at 629, 98 S.Ct. at 2538.

4. Finally, the public interest is best served by the grant of preliminary injunction relief. Significantly, plaintiff's members are in the business of complying with the comprehensive regulatory scheme and developing and utilizing safe and efficient treatment and disposal systems for hazardous wastes. Thus, human health and the environment will not be adversely affected by the issuance of injunctive relief.

It may not be gainsaid that the public interest is best served when unconstitutional laws are enjoined.

■ South Carolina has, by the challenged statutes, Executive Orders and regulations, erected an unlawful economic barrier at its border. Notwithstanding the stated purpose expressed in these laws, to limit within its borders the treatment and disposal of wastes generated from other states—while not imposing similar prohibitions on wastes generated within South Carolina—it cannot isolate itself from the flow of commerce by erecting discriminatory barriers.

## CONCLUSION

Upon consideration of pleadings, the affidavits, the memoranda and arguments of counsel, and for the reasons above stated, the plaintiff's motion for a preliminary injunction is hereby granted.

IT IS SO ORDERED.