JaPITCHER, Judge.
Defendant, Paul Piazza, was charged by affidavit with the sale and/or purchase of game fish in violation of LSA-R.S. 56:327A. Defendant pled not guilty. Following a bench trial, the district court found defendant guilty as charged. The district court sentenced defendant to imprisonment in the parish jail for thirty days and ordered that defendant pay a fine of four hundred dollars plus court costs. The court ordered that, in default of payment of the fine and costs, defendant serve sixty days in the parish jail. The court also ordered that any licenses issued to defendant by the state in connection with his business operations be revoked and not reinstated during the period of issuance and for one year thereafter. Defendant sought judicial review of his conviction by application for a writ of review. On May 23, 1994, we denied defendant’s application under docket number 94 KW 0425. Thereafter, on September 2, 1994, under docket number 94-KK-1678, the Louisiana Supreme Court granted defendant’s writ application for review of this Court’s denial of defendant’s application to this Court. In granting the application, the Supreme Court remanded the case to this Court for briefing, argument and opinion. See State v. Piazza, 94-1678, (La. 9/2/94), 642 So.2d 1273.
In his application, defendant urges seven assignments of error, to wit:
1.
The district court erred by finding defendant guilty without the state having proved every element of LSA-R.S. 56:327A, the statute defining the charged offense.
2.
The district court erroneously interpreted and applied LSA-R.S. 56:327A by finding-defendant guilty of violating a duty not imposed by that statute but rather a duty imposed by LSA-R.S. 56:327.1 (a statute defendant was not charged with having violated).
3.
“The District court erred in that defendant was charged and convicted of violating La. R.S. 56:327(A), when in effect all the State’s evidence was probative to a different statute, namely La.R.S. 56:327.1, which is not a lesser included offense of La.R.S. 56:327(A).”
4.
_JjThe district court erroneously interpreted and misapplied LSA-C.E. art. 702 in accepting John Burden [sic] and Howard Ra-gillio as expert witnesses.
5.
The district court made a manifestly erroneous finding of fact that the fish which defendant was transporting on July 27, 1993, were not the fish defendant had reported to the Department of Wildlife and Fisheries on July 21, 1993.
6.
The district court erred by failing to correctly apply the constitutional standard of proof beyond a reasonable doubt in finding defendant guilty.
7.
The district court erroneously interpreted and misapplied LSA-C.E. arts. 710, 711 and 712 in denying defendant’s motion for a continuance.

*1361
FACTS

At about 7:30 p.m. on July 27, 1993, Agent Jeff Mayne of the Louisiana Department of Wildlife and Fisheries stopped a truck at a weigh station in Slidell, Louisiana. The truck was a common carrier and had been enroute to deliver fish to a point of destination on the East Coast. Mayne found invoices [1] inside the truck and determined that the truck was transporting 1121 pounds of hybrid striped bass.[2] Aware that it was illegal to sell hybrid striped bass other than those aquaculturally raised in accordance with law, Mayne called the Department of Wildlife and Fisheries to determine when the Department had last received a report of a shipment of hybrid striped bass to defendant. Mayne contacted the ^Department of Wildlife and Fisheries and was informed by “Eula” that the last report to the Department of a sale of hybrid striped bass to defendant had been six days earlier, on July 21. Because the fish that were being transported were, in Mayne’s judgment, much fresher than six days old, Mayne seized the 1121 pounds of fish.
On the following day, at about 3:00 p.m., Agent John Burdon of the Louisiana Department of Wildlife and Fisheries, with the assistance of a fellow agent, Howard Ragillio,[3] examined four of the seized fish. The agents determined that the fish had been dead for seventy-two hours or less. On the day after this determination, the seized fish were sold by the Department at an auction sale to the highest bidder, defendant’s brother-in-law, Andy Scallion.
On August 3, 1993, Mayne examined the records of defendant’s seafood business. He determined that during the period from June 30 through July 21, 1993, defendant had reported in to the Department the sales of hybrid striped bass to him totaling 9,840 pounds of hybrid striped bass and that during that same period defendant had sold a total of 12,573 pounds of hybrid striped bass (2,733 pounds more than had been reported to the Department). While at defendant’s place of business, Mayne issued a citation to defendant for the instant offense.
State Exhibit S-l consisted of a copy of a synopsis of Mayne’s determinations and copies of invoices of defendant’s business pertaining to the sales of hybrid striped bass by the business from July 2 through July 27, 1993. S-l disclosed that the last report to the Department of striped bass received by defendant was a report of 2,656 pounds on July 21.
The state also introduced in evidence a copy of a memorandum dated July 29, 1993, from Burdon to Agents David Folse and Jeff Mayne, detailing the results of the July 28 examination by Burdon and Ragillio of four of the seized fish (S-2). The memorandum disclosed the following. At about 2:45 p.m., on July 28, Burdon |5randomly selected four of the seized bass, which had been placed in a cooler following their seizure. The bass were iced in waxed cardboard containers. Burdon, with the assistance of Ragillio, began an examination of the four fish at 3:00 p.m. Based on the physical condition of the fish, Burdon and Ragillio determined to the best of their judgment the fish had been dead for seventy-two hours or less, i.e., that *1362 they had been harvested no more than seventy-two hours earlier. More particularly, the memorandum cited the following physical features of the fish as leading to the determination:
EXTERNAL FEATURES
The fish were in extremely good physical condition and had a very fresh appearance. The fish were very flexible and were not slimy from mucous on the exterior of the body. There was no noticeable odor from decomposition. The gill lamellae were extremely red with no fading of color. The coloration of the fish was well pronounced and the scales were well intact. The eyes were not sunken in but were oval in form.
The eyes were slightly translucent with the pupils clearly visible with no shrinkage of eye tissue.
INTERNAL FEATURES
Color of organs pronounced with no apparent fading. No breakdown of organs or shrinkage due to water loss. No fluids in body cavity. No swelling of gut (stomach) due to gases formed by microbial organisms. Connective tissues between organs and body tissues well intact. Texture of flesh extremely firm.
Burdon and Ragillio gave testimony consistent with the content of S-l at the trial. Burdon testified that, on July 28 when he began his examination of the fish, the gills of the fish were bright red. After the fish were held over the following night in a refrigerator, the gills started to turn pink; and on the following day the gills began to change to a white color. The change in color indicated a movement of blood cells. Burdon explained that freshly caught or harvested fish have “real red gills.” Other characteristics of the fish leading Burdon to conclude that they were no more than seventy-two hours old were that the exterior of the fish did not have a “slimy mucousy composition,” as is usually found in fish which have been harvested for a “period of time.” There was no noticeable odor from decomposition and the coloration of the fish was “well pronounced.” _|&A major factor upon which he based his opinion was that the eyes of the fish were “not sunken in but were open and formed.” The fish displayed no shrinkage of eye tissue and the eyes were slightly translucent. The eyes of fish that are held for “awhile” start becoming opaque, i.e., turning a white milky color. An interior examination of the fish revealed that the fatty tissue inside was a white creamy color rather than having the appearance of that of an animal that had been held over for some time whereby it starts to take on a “yellowish tainted look.” There also were no fluids inside the body cavities of the fish. Burdon surmised that under the conditions these fish were found (i.e., iced and not frozen), they would probably take on a strong fishy odor in about five days. However, he stated that these fish appeared to have been harvested on either the day before he examined them or two days prior to the examination. The fish looked “extremely fresh” and in good condition. Burdon admitted that he would be more comfortable in his opinion if he had a scientific test to back up his opinion. While not ruling out the possibility that there were scientific tests available to determine how long fish have been dead, Burdon stated that he knew of no such tests. Burden admitted that someone with twenty years experience in the seafood business with knowledge of how to pack fish would be more likely to be able to keep fish fresh.
Ragillio gave testimony consistent with Burdon and the information contained in S-l. He stated that the fish were “extremely fresh” and it was his opinion that the fish were seventy-two hours old or less from the time they had been harvested but that that was “stretching it.” Ragillio testified that he did not believe the fish could have been packaged in a manner that they could have stayed fresh for longer than seventy-two hours and have the appearance displayed by these fish. Ragillio further testified that if the fish were preserved for six days, he would like to know the “recipe.”
Defendant testified that he is a seafood wholesaler who buys and sells hybrid striped *1363 bass. He buys the fish from sources in LTexas, Louisiana and Mississippi. According to defendant, prior to each shipment of fish into Louisiana from an out of state source, he uses an 800 telephone number to notify the Department of Wildlife and Fisheries of the invoice number, amount of fish and other pertinent information regarding the shipment of fish into this state.
Defendant testified that on July 28, 1993, he received a telephone call from the driver of the truck who was taking his fish out of state to the East Coast, informing him of the seizure of his fish by Mayne. According to defendant, the driver indicated to him that the agent stated that the Department had not received a report on July 21 of hybrid striped bass being shipped in by defendant but the Department did have a July 15 report of such a shipment. On July 28, after defendant received the call from the driver, defendant telephoned the Department of Wildlife and Fisheries and spoke to Mayne. Mayne told defendant that defendant’s last report in to the Department of a shipment of hybrid striped bass was on July 15. Defendant corrected Mayne, informing him that the last shipment he had reported was to “Eula” on July 21. About an hour later, defendant telephoned “Eula.” “Eula” confirmed that defendant’s last report in to the Department had been on July 21, and she “made it sound to me like she had found it, like it [had] got[ten] misplaced [but had been found].” Thinking that the matter had. been resolved and that he would be able to pick up his fish that had been seized, defendant telephoned Mayne. However, Mayne told him that the fish were no older than two days old, “[s]o there was a story change.”
Defendant testified that the fish he called in on July 21 were received at his place of business on the following day. At about 11:30 a.m. on July 27, some of the fish were loaded on the truck for delivery to the East Coast. However, some of the fish from the July 21 reported shipment were not yet sold and, thus, remained in defendant’s possession. Defendant consistently and emphatically asserted that the fish seized by the Department were part of the shipment he called in to the Department on July 21.
IgDefendant explained the procedure his company uses in handling fish. Before he picks up fish at his Texas supplier, the fish are harvested and cold chilled, which means the fish are placed inside a slush tank and actually iced down very heavily to immediately bring down the body temperature of the fish. The purpose of this procedure is to stop deterioration of the fish. At the time the fish are loaded on defendant’s truck which transports the fish into Louisiana, the fish are re-iced. When the fish arrive at defendant’s business place in Harahan, the fish are re-iced again and placed in fifty pound boxes. Defendant explained that each time the fish are re-iced, bacteria are being washed from the fish, which helps the fish last longer. The truck into which the fish are placed is refrigerated, and the fish are kept refrigerated while they are at defendant’s business.
After defendant’s brother-in-law purchased the seized fish at the auction, defendant purchased some of them from his brother-in-law so that defendant could take them to a laboratory of his choice for examination. Defendant contacted experts, including one at Louisiana State University, who told defendant the only method of determining fish deterioration was by appearance of the fish. According to defendant, he “called all over” and learned that there are no scientific tests to make such a determination. The only method of determination is by “appearance and smell.” Testifying as an expert witness in fish observation, defendant stated that to someone observing his fish, who was unfamiliar with the procedures he uses in handling and packaging fish, the fish would appear to be “fresher longer.”
Defendant supplied Michael Russell, the president of Central Analytical Laboratories, Inc., with three samples of fish for purposes of comparison and studying the deterioration of the fish. Defense Exhibit D-l, a copy of a letter from Michael Russell to defendant, discloses the findings made by Central Ana *1364 lytical Laboratories regarding its examination of the samples submitted by defendant. D-l discloses the following. The samples of hybrid striped bass defendant delivered to the laboratory were labeled as ^Samples A, B and C. Sample A consisted of one fish said to have been freshly caught, i.e., within the preceding twenty-four hours. Sample B consisted of the fish from the July 21 reported shipment of fish, which had not yet been sold by defendant and remained in his possession. Sample C consisted of three fish said to have been from the fish seized by the Department of Wildlife and Fisheries, sold at public auction and subsequently acquired by defendant from the individual who purchased the seized fish at the auction. The samples were chill preserved by numerous chemical chill packs. The laboratory was requested to “examine these submitted samples and render an opinion as to whether it was possible to determine the relative time since each was caught.” On July 30, 1993, Russell and Cathy Robinson, the chief technician of the laboratory’s microbiology and food sanitation section, examined the samples. The letter recited the observations of Russell and Robinson concerning each of the samples. It concluded that the overall condition of Sample A would support the claim that it was freshly caught. Samples B and C each demonstrated physical signs of fish not freshly caught. Samples B and C appeared to be in about the same physical state but it could not be determined with any exactness how much time had elapsed since the fish in either sample had been caught. Finally, the report stated that Russell and Robinson were not aware of “any test or methodology which would enable an exact determination of the time elapsed since a fish had been caught.”
Defendant also introduced Defense Exhibit D-2 in evidence. D-2 consisted of copies of three invoices, which defendant stated were for sales of striped bass by an in state fish farm to him. One of the documents is not dated. The other two are dated July 9 and 16, 1993, and are for 1386 and 1423 pounds of fish respectively. According to defendant, these invoices accounted for the 2733 pound difference between the 9,840 pounds of hybrid striped bass that S-l indicates were reported in to the Department and 12,573 pounds of hybrid striped bass sold by defendant.

ASSIGNMENTS OF ERROR NUMBERS ONE, FIVE AND SIX

lioBy means of these assignments of error, defendant makes several arguments contending that the evidence introduced at trial was insufficient to prove he committed the charged offense.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
In assignment of error number one, defendant essentially makes two arguments. First, he argues that the state failed to prove he sold and/or purchased fish of the kind whose sale and/or purchase is proscribed by LSA-R.S. 56:327A. Second, defendant argues that he cannot possibly be guilty of the charged offense, because (1) some of the seized fish were fish produced and regulated pursuant to LSA-R.S. 56:411, et seq. and (2) the remainder of the fish were aquaculturally-raised fish imported into this state pursuant to LSA-R.S. 56:327.1 and, thus, not game fish.
LSA-R.S. 56:327A(l)(a) provides, in pertinent part, as follows:
A. (1) No person shall purchase, sell, exchange, or offer for sale or exchange, or possess or import with intent to sell or exchange any of the following fish:
(a) Any freshwater game fish, including but not limited to largemouth bass (Mi-cropterus salmoides), spotted bass (Mi-cropterus punctulatus), rock bass (Amblo- *1365 pites rupestris), black or white crappie (Pomoxis nigromaculatus, p. annularis), white bass (Morone chrysops), yellow bass (Morone mississippiensi), striped bass (Mo-rone saxatillis), hybrid striped bass (striped bass-white bass cross or striped bass-yellow bass cross), any species of bream (Lepomis sp.) or any other species of freshwater game fish as defined in R.S. 56:8(44) except hybrid striped bass (striped bass-white bass cross or striped bass-yellow bass cross) which are produced and regulated pursuant to provisions of R.S. 56:411 et seq. governing domestic fish farming ...
Thus, to support a conviction for the charged offense the state must prove that the accused purchased and/or sold freshwater game fish, which includes hybrid striped bass, other fish | nspecifically enumerated in LSA-R.S. 56:327A(l)(a), or any other species of freshwater game fish as defined in LSA-R.S. 56:8(44).
LSA-R.S. 56:8(44) defines “freshwater game fish” as “any species of fish found in the freshwaters of the state that are taken for sport or recreational purposes.” LSA-R.S. 56:8(51) further defines “game fish” as “all species of freshwater and saltwater fish which are taken for recreational purposes, and which are taken with the aid or use of a line, reel, rod, and artificial or natural bait.”
Defendant argues that the state failed to prove that the fish in question were “freshwater game fish” because the state offered no evidence that these fish were taken for sport or recreational purposes or taken with the aid or use of a line, reel, rod, and artificial or natural bait. Defendant further argues that the state failed to prove that the fish in this case were “found in the freshwa-ters of the state.”
We find the above arguments to be without merit. Defendant was charged with the sale and/or purchase of hybrid striped bass, a species of fish specifically enumerated in LSA-R.S. 56:327A(l)(a). As such, the general definition of “freshwater game fish” contained in LSA-R.S. 56:8(44) does not apply in this instance.
Next, defendant argues that he is not guilty of the charged offense because some of the seized fish were produced and regulated pursuant to LSA-R.S. 56:411, et seq. LSA-R.S. 56:327A(l)(a) expressly provides one exception to its proscriptions regarding hybrid striped bass. This exception allows for the purchase, sale, etc. of hybrid striped bass produced and regulated pursuant to LSA-R.S. 56:411 et seq., which governs domestic fish farming operations conducted in Louisiana. Defendant argues that some of the fish seized had been purchased from in-state fish farms and thus, are exempted from LSA-R.S. 56:327A.
LSA-C.Cr.P. article 479 provides as follows:
An indictment shall not be invalid or insufficient for the reason that it fails to negative an exception, excuse, or proviso contained in the statute creating or | ^defining the offense. An exception, excuse, or proviso must be urged by way of defense.
Therefore, defendant has the burden of proving that the fish in question were fish acquired by him from domestic fish farms in Louisiana, pursuant to LSA-R.S. 56:411. See State v. Lewis, 427 So.2d 835, 840 (La. 1982).
Defendant introduced copies of invoices which he stated were for sales of hybrid striped bass to him from in state fish farms. These invoices were introduced in an attempt to account for the 2,733 pound difference between the 9,840 pounds of hybrid striped bass that S-2 indicated were reported in to the Department and 12,573 pounds of hybrid striped bass sold by defendant. Two of the three invoices are dated July 9 and July 16, 1993, respectively. Defendant also testified that all of the fish on July 27 were part of the shipment of fish from Texas which he reported in to the Department of July 21.
The evidence offered by defendant was in conflict with Burdon and Ragillio’s *1366 testimony. It was their opinion that the seized fish had been harvested no more than seventy-two hours prior to their examination of the fish on July 28. Thus, the trier of fact was faced with determining which of these witnesses was more credible. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Gordon, 582 So.2d 285, 292 (La.App. 1st Cir. 1991). See also State v. Hillman, 613 So.2d 1053, 1057 (La.App. 3rd Cir.), writ denied, 617 So.2d 1181 (La.1993) (which recognizes that the trier of fact retains the right to accept or reject the conclusions of an expert witness.) In finding defendant guilty, the district court clearly indicated that it accepted the testimony given by Burdon and Ragil-lio as more credible than that given by defendant. The credibility of the witnesses’ testimony is a matter of weight of the evidence. A determination of the weight to be given evidence is a question of fact for the trier of fact, not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987). In making this credibility call, it is obvious that the court concluded that the [i3seized fish were not part of the shipment of fish reported in to the Department on July 21. Thus defendant failed to establish that the fish seized by the Department were acquired by him from Louisiana domestic fish farms.
Defendant further argues that some of the fish were aquaculturally-raised fish imported into this state pursuant to LSA-R.S. 56:327.1 and thus, not game fish.
LSA-R.S. 56:327.1 provides, in pertinent part, as follows:
A. Notwithstanding the provisions of R.S. 56:327(A)(l)(b)(i), as amended by Section 2 of Act No. 78 of the 1990 Regular Session, to the contrary, cultured fish raised in an aquacultural environment may be imported into this state. No live fish shall be imported under this Section.
B. As used in this Section, the following terms shall have the following meanings:
(1) “Aquaculture” means aquaculture as defined in R.S. 56:356.
(2) “Cultured fish” means saltwater game fish covered by the provisions of R.S. 56:327(A)(l)(b)(i), or shellfish.
C.(1) With the exception of large-mouth bass (Micropterus salmoides), spotted bass (Micropterus punctulatus), shadow bass (Ambloplites ariommus), black or white crappie (Pomoxis nigromaculatus, P. annularis), white bass (Morone chrysops), yellow bass (Morone mississippiensi), striped bass (Morone saxatilis), and any species of bream (Lepomis supp. and Cen-trarchus sp.), cultured fish, raised in an aquacultural environment, may be imported into this state for sale at wholesale or retail.
* * * * * *
Defendant cites this statute as authorization for the importation of hybrid striped bass from another state into Louisiana. In our view, the exception contained in LSA-R.S. 56:327A(l)(a) merely acknowledges only one of the circumstances in which the purchase, sale, etc. of hybrid striped bass is justified as authorized by law.[4] An accused may raise a defense such as “justification” for such conduct which would otherwise be criminal, e.g., that the accused’s conduct is for any reason authorized by law. See LSA-R.S. 14:18(3). Since “justification” defenses areji4not based on the nonexistence of any essential element of the offense, but, rather, on circumstances which make the accused’s conduct excusable on policy grounds, such defenses should be treated as affirmative defenses which the accused must establish by a preponderance of the evidence. State v. Cheatwood, 458 So.2d 907, 910 (La.1984).
However, we find the language contained in this statute to be confusing, and it is unclear whether this statute actually authorizes the importation of hybrid striped bass. LSA-R.S. 56:327.1 authorizes the importa *1367 tion of “cultured fish” into this state. Subsection B(2) then defines “cultured fish” as “saltwater game fish covered by the provision of R.S. 56:327(A)(l)(b)(i) or shellfish.” Therefore, at this point, the statute does not allow for the importation of “freshwater game fish.” However, LSA-R.S. 56:327.1 then provides that, with the exception of various freshwater game fish enumerated in the statute, “cultured fish” may be imported into this state for sale at wholesale or retail.[5]
As a consequence, LSA-R.S. 56:327.1 is confusing because it appears to be open to multiple, diametrically opposed interpretations. One possibility is that the definition of “cultured fish” could be construed as limiting the importation to saltwater game fish or shell fish. Under this interpretation, the authorization to import aquaculturally-raised cultured fish would not extend to the importation of aquaculturally-raised freshwater fish.
Another alternative is that the legislature, by excepting the freshwater game fish enumerated in Subsection C(l) from the definition of cultured fish, intended to authorize the importation of any aquaculturally-raised freshwater game fish not excepted by Subsection C(l) from the definition of cultured fish. Under this alternative, because hybrid striped bass are not excepted from the [ ^definition, the authorization in Subsection C(l) would include the importation of hybrid striped bass raised in an aquacultural environment into this state for sale at wholesale or retail.[6]
LSA-R.S. 14:3 provides as follows:
The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.
In light of the conflicting interpretations outlined above, we conclude that LSA-R.S. 56:327.1 must be interpreted to allow the importation of aquaculturally-raised hybrid striped bass into this state for sale at wholesale or retail.
As noted earlier, the district court accepted the testimony given by Burdon and Ragillio, and concluded that the seized fish were not part of the shipment of fish reported in to the Department on July 21. Thus, the defendant failed to establish that some of the fish seized (i.e. those fish imported from Texas) were aquaculturally-raised fish.
In assignments of error numbers five and six, defendant argues that the court made a manifestly erroneous finding of fact that the seized fish were not the fish defendant reported to the Department on July 21 and that the court failed to properly apply the constitutional standard of proof beyond a reasonable doubt in finding him guilty.
| ^Viewing all the evidence in the light most favorable to the state, any rational trier of fact could have concluded that the evidence proved beyond a reasonable doubt that *1368 defendant sold freshwater game fish, hybrid striped bass, conduct proscribed by LSA-R.S. 56:327A(l)(a). Defendant failed to establish where he obtained the fish seized by the Department. The evidence is, therefore, clearly sufficient to support the conviction.
Hence, defendant’s assignments of error lack merit.

ASSIGNMENTS OF ERRORS NUMBERS TWO AND THREE

By means of these assignments of error, defendant argues that the key issue at trial was whether or not the seized fish were the fish he had reported in to the Department on July 21 and that the reporting requirements he allegedly violated were contained in LSA-R.S. 56:327.1 rather than LSA-R.S. 56:327A. Consequently, defendant concludes that his conviction of violating LSA-R.S. 327A is the equivalent of an unresponsive verdict since a violation of LSA-R.S. 56:327.1 is not a lesser and included offense of the charged offense.
Defendant was not charged with violating any “reporting requirements”. The affidavit in evidence states that the defendant was charged with the “sale and/or purchase of game fish”. Additionally, LSA-R.S. 56:327A(e) provides as follows:
Prior to each shipment in to this state of any saltwater game fish, the buyer or handler of such shipment shall notify the secretary or his designated agent of its pending arrival and shall possess a bill of lading therefor. The bill of lading shall state the species of fish contained in each shipment, the number of fish or parts thereof, the origin of the shipment, the destination of the shipment, the consignee and consignor, and where applicable, the grower’s name and fish farmer’s license number. Wholesalers, their agents, and commercial transporters delivering the shipment or portions thereof to retail dealer shall provide each dealer with a copy of their bill of lading and shall indicate thereon the date of delivery to the retailer, the species of fish delivered, and the number of fish or parts thereof delivered. Both wholesale and retail dealers shall maintain a file of such bills of lading which shall be open to inspection by the secretary, his agents, or any enforcement agents. (Emphasis ours).
| 17Thus, LSA-R.S. 56:327A(c) does not have any reporting requirement for the importation of freshwater game fish.[7] Regardless of whether or not defendant was required by law to do so, defendant testified that prior to transporting hybrid striped bass into the state from out-of-state, he made reports of the shipments to the Department. It was on the basis of his July 21 reported purchase of hybrid striped bass that he sought to justify his conduct in selling the seized fish.
Defendant correctly observes that LSA-R.S. 56:327.1D imposes on the producer of cultured fish in the foreign jurisdiction (and not the purchaser of such fish) a requirement to make reports to the Department. LSA-R.S. 56:327.10(2) requires wholesalers and retailers who purchase such fish to maintain a file of any bills of lading for cultured fish imported by them into this state. Therefore, defendant was not required to make the reports of his purchases of fish from out-of-state under LSA-R.S. 56:327.1.
Accordingly, these assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER FOUR

By means of this assignment, defendant contends that the district court erred by accepting Burdon and Ragillio as expert witnesses qualified to render opinions as to length of time the seized fish had been dead, i.e., harvested.
Louisiana Code of Evidence article 702 provides as follows:
*1369 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise.
The trial court is vested with wide discretion in determining the competence of an expert witness, and its ruling on the qualifications of the witness will not be disturbed absent an abuse of discretion. State v. Williams, 615 So.2d 1009, 1022 (La.App. 1st Cir.), writ denied, 619 So.2d 543 (La.1993).
Burdon had never testified in any courts in Louisiana on the physiology or decomposition of fish. He was employed in the Marine | ^Fisheries Division of the Department of Wildlife and Fisheries for “21 plus years.” Prior to his employment, he had obtained a B.S. and a masters degree in zoology. Burdon had participated in numerous marine fisheries projects. According to Burdon, for about eighteen or nineteen years he had been involved in work relating to continuous monitoring programs whereby fish are brought in weekly for sorting, etc. Burdon stated that often the fish are held over for one, two or three days and “you are subconsciously and consciously looking at the deterioration of these species.” Burdon stated that he was not qualified to conduct any scientific test to determine how long fish were dead, with the exception of a determination based on his experience of having observed the physical characteristics of fish over the years. He indicated that there are many factors that aid in one’s determination, including the method of packing and handling of fish.
Ragillio had never testified in court as an expert in determining the amount of time that had elapsed since fish were harvested. He was employed with the Department of Wildlife and Fisheries as district supervisor of inland fisheries, and he had twenty-seven years of experience with the Department. Ragillio was crew chief of the striped bass fish hatchery conducted each year at Toledo Bend. Ragillio had “a lot of experience” dealing with striped bass. He had been involved in monitoring fish, seeing them in various conditions including fish placed in ice chests or packed in ice. Ragillio had a B.S. in wildlife management and had been certified by the American Fishery Society of American Fishery Science. His course of study had included courses in biology and zoology. Ragillio indicated that he had observed fish in various stages of decomposition and that temperature is a big factor in determining decomposition. He stated that if the seized fish were preserved for six days he would like to “know their recipe.”
Ragillio indicated that he knew of no test for determining how long a fish had been dead or harvested. Consistent with Defense Exhibit D-l, defendant himself testified that he had inquired as to whether or not there were any such tests, that there were none and | igthat the only method of determination was by observing and smelling the fish.
Notwithstanding any assertion by defendant to the contrary, the testimony of Bur-don and Ragillio was relevant to defendant’s defense which essentially was that his sale of the seized fish was lawful, i.e., justifiable conduct, conduct authorized by law, since the fish he sold were part of the shipment of fish he reported in to the Department on July 21. More specifically, however, based upon the witnesses’ knowledge, skill, experience, training and education, we find no abuse of discretion by the district court in accepting the witnesses as competent to testify as experts.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN

By means of this assignment, defendant contends that the district court erred by denying his motion for a continuance of the trial.
At the beginning of defendant’s November 2, 1993, trial, defense counsel made an oral motion for a continuance. Defense counsel informed the court that he had just received *1370 “this file last week” and was just given notice by his client that there were some witnesses from the Department of Wildlife and Fisheries that he would like to subpoena and that he would also like “to subpoena, as well as produce a biologist report.” At that point, the district court denied the motion. Thereafter, apparently to amplify the record, defense counsel indicated he had been retained by defendant on October 27 or 28, 1993. Defense counsel elaborated on his grounds for the motion, during the following remarks:
I haven’t had time to prepare an adequate defense for Mr. Piazza. Additionally, some time after the initial calling of the docket today I was given a copy of the biologist report and what I would consider exculpatory evidence which was later taken back from me, and again I have not had adequate time to prepare a defense and cross-examination of that. Specifically the exculpatory evidence or the additional evidence brought up some information which looks like that is going to become an issue, which I was not aware of, dealing with an accounting for all the fish in July of 1993. Let’s see, and as I said before, there was [sic] some other witnesses which we haven’t had time to subpoena, including three people who work for the Louisiana Department of Wildlife and Fisheries, as well as our Roexperts. I just want to put that on the record. Your Honor, I would ask this be continued.
At that point, the district court maintained its denial of the motion for continuance.
Before the state began its presentation of its case-in-chief, the state and the defense entered into stipulations. The first stipulation was that if defendant’s biologists (Michael Russell and Kathy Robinson) testified for the defense they would give testimony consistent with the substance of their report.[8] A second stipulation was that, on July 21, defendant had made a call to “Eula at the Louisiana Department of Wildlife and Fisheries.”
A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based. LSA-C.Cr.P. art. 707. Whether or not a refusal to grant a continuance was justified depends primarily upon the circumstances of the particular case. The denial of a motion for continuance is not a ground for reversal of a conviction absent an abuse of discretion and a showing of specific prejudice caused by the denial. State v. Sensley, 460 So.2d 692, 698 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1374 (La.1985). Additionally, when the motion is grounded on insufficient time to prepare a defense, the preparation time must have been so short as to undermine the basic fairness of the proceedings. State v. Simon, 607 So.2d 793, 798 (La.App. 1st Cir.1992), writ denied, 612 So.2d 77 (La.1993).
An oral motion for continuance presents nothing for review upon appeal. State v. King, 563 So.2d 449, 455 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990). We are aware that this rule may be disregarded whenever the circumstances arise unexpectedly and defense counsel has no opportunity to prepare a written motion. See State v. Penny, 486 So.2d 879, 887-88 (La. App. 1st Cir.), writ denied, 489 So.2d 245 (La.1986). However, we find the situation present herein to be one in which the rule should be applied. In any event, this case was a relatively simple |2icase, factually and legally. Defendant never specifically informed the district court of the identity of the witnesses he wanted to subpoena or what facts they would disclose in the testimony he expected them to give. In addition to the stipulation concerning the telephone call made by defendant to “Eula,” defense counsel effectively cross-examined Mayne concerning this call and during defendant’s own testimony he testified extensively concerning the call. As previously noted in this opinion, the state introduced S-l (which reflected Mayne’s synopsis of the pounds of fish reported and sold by defendant during the period of June 30-July 27) and S-2 (the copy *1371 of Bur don’s memorandum); and defendant introduced D-l. Defendant also introduced D-5, copies of invoices of fish sales to him to account for the 2,733 pounds of fish which S-1 reflected as being the difference between the fish reported and sold by defendant during the period June 30 through July 27. Under these circumstances, defendant has failed to show that the district court abused its discretion and that he sustained specific prejudice from the denial of the motion.
This assignment lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
FITZSIMMONS, J., concurs with reasons.

. Invoices and/or copies thereof included in State Exhibit S-l and Defense Exhibit D-5 evidenced the sale, by a company named Vincent Piazza, Jr. & Sons Seafood, Inc., of 104 pounds of the seized fish to Century Seafood in Philadelphia, Pennsylvania and the remaining 1017 pounds of the seized fish to Caleb Haley in New York, New York.

. All of the state’s witnesses consistently used the terminology “striped bass" rather than "hybrid striped bass” during the trial. State Exhibit S-2 (Burdon's biologist report) and Defense Exhibit D-l (the lab report of Central Analytical Laboratories, Inc.) used the term "hybrid striped bass” in referring to the seized fish. In his testimony at trial, defendant also used the term "hybrid striped bass.” Additionally, one of the invoices in Defense Exhibit D-5 (invoice #1050 documenting a July 21, 1993 sale of fish to defendant for $5,976.05) uses the term "hybrid striped bass.”
Although the record is contradictory as to the identity of the fish seized, we conclude that the evidence reflects that they were "hybrid striped bass.” Therefore, we will refer to the fish as "hybrid striped bass” throughout the opinion.

.In S-2, "Ragillio” is spelled "Rogillio."

. This assertion is supported by the language contained in LSA-R.S. 56:327.1A which provides that "[n]otwithstanding the provision of R.S. 56:327(A)(l)(b)(i), as amended by Section 2 of Act No. 78 of the 1990 Regular Session, to the contrary,.... ”

. Excepting from the coverage of a statutory definition that which is already not within its coverage defies both common sense and logic. Nevertheless, that is precisely what Subsection C(l) of Section 327.1 does, since the freshwater game fish enumerated in Subsection C(l) are not saltwater game fish or shellfish, the only fish covered by the definition of cultured fish set forth in Subsection B(2).

. We note that LSA-R.S. 56:327 contains language which is similarly confusing. LSA-R.S. 56:327A(l)(a) prohibits the sale, purchase, exchange, or offer for sale or exchange, or possession or importation with intent to sell or exchange of any freshwater game fish. Yet, Subsection A(b)(i) which deals with the sale, purchase, etc. of saltwater game fish, contains an exception regarding certain freshwater game fish fingerlings. This exception provides as follows:
... game fish fingerlings, not exceeding a maximum total length of three inches, of rock bass, white bass, yellow bass, crappie, and bream, and, not exceeding a maximum total length of six inches, of largemouth bass, spotted bass, and striped bass, brought into the state by and from legal and certified out-of-state commercial fish hatcheries, for sale to Louisiana residents for stocking private waters.

. We note that Agent Mayne's testimony indicated that he believed such a requirement existed for freshwater game fish.

. The reference to the report is an apparent reference to Defense Exhibit D-l, the copy of Russell’s letter to defendant, which was later introduced into evidence by defendant.