JiPER CURIAM: *
Relator was charged by affidavit filed in the 22nd Judicial District Court with violation of La.R.S. 56:327(A), which prohibits the sale, exchange, or importation for sale, of certain enumerated freshwater and saltwater game fish and any other species of game fish as defined by La.R.S. 56:8(44), (82) and (83). After a bench trial on November 2, 1993, relator was found guilty as charged. The court sentenced him to 30 days in the St. Tammany Parish Jail and imposed a fine of $400.00. The court also revoked relator’s license as a wholesale fish distributor during the period for which it was issued and for one year thereafter. On relator’s application for review, the First Circuit affirmed his *1126 conviction and sentence. State v. Piazza, 94-1841 (La.App. 1st Cir. 5/5/95), 655 So.2d 1357. We granted writs to consider the nature of the offense defined by La.R.S. 56:327(A) and whether the trial court erred in basing its verdict on the opinions of two state experts that the fish seized in connection with this prosecution appeared too fresh to have originated, as relator claimed, in a lawful shipment of aquaculturally harvested fish from Texas. We now reverse.
UOn the evening of July 27, 1993, Jeff Mayne, an enforcement agent of the Wildlife and Fisheries Department (“Department”), seized a shipment of hybrid striped bass found in a truck stopped at the 1-10 weigh scales outside of Slidell, Louisiana. The shipment, from relator’s wholesale fish business in Harahan, Louisiana, was destined for East Coast buyers and contained approximately 1,100 pounds of hybrid striped bass iced down in 22 boxes. It was undisputed at trial that relator had reported to the Department on July 21, 1993, the importation of 2543 pounds of hybrid striped bass from the Silver Streak Bass Co., a licensed aquaculture fish producer located in Seguin, Texas. In Mayne’s judgment, however, the fish he found at the weigh station appeared “a lot fresher than six days old,” and he seized the entire shipment. On the following afternoon, Wildlife agents John Burdon and Howard Ragillio inspected four fish taken from the shipment. They also concluded that the fish appeared too fresh to have originated in the July 21 shipment and that the samples were no more than 72 hours old from the time that they had been harvested. After inspecting relator’s business records, which appeared to document a discrepancy of over 2,000 pounds between fish received by relator between June 30,1993 and July 21,1993, and fish sold by him over the same period of time, Burdon swore out the affidavit charging relator with a violation of La.R.S. 56:327(A).
Burdon and Ragillio testified at trial as experts, as did relator, who qualified as an expert in the commercial packaging and transportation of seafood on the basis of his lifelong work in a family business dating back 100 years. According to relator, who deals with fish farms throughout the Louisiana-Mississippi-Texas area and purchases aquaeulturally-raised hybrid striped bass from them, all of the fish seized on July 27 had come from the July 21 shipment from Texas which he received on the following day. Prompt and repeated icings from the moment of harvesting had made his fish “appear to be fresher longer.” |3Relator also produced invoices for fish purchased from Bayou Blue Mariculture, an in-state fish farm, to account for the discrepancy found in his records by Burdon. For the court, the ease “boil[ed] down to simply a matter of whose experts convince the Court and convince the Court beyond a reasonable doubt that their position [wa]s correct.”
In 1974, Louisiana’s law regarding sport and commercial fishing, La.R.S. 56:311 et seq., underwent comprehensive revision. La. Acts 1974, No. 223. As amended and reenacted, La.R.S. 56:327 provided that “[n]o person shall sell, exchange, expose or offer for sale or exchange, or have in possession for sale or exchange or purchase any freshwater game fish.” La.R.S. 56:311(21), reenacted in 1981 as La.R.S. 56:8(44), defined the term freshwater game fish as “any species of fish found in the fresh waters of the state that are taken for sport or recreational purposes.” In 1976, the prohibition against the sale of freshwater game fish became subsection A of § 327 when the legislature added subsection B relating to commercial licenses for shrimp, oysters and fish. La.Acts 1976, No. 576.
In State v. Bates, 363 So.2d 469, 471-72 (La.1978), this Court found no evidence in the language of § 327(A), or in former § 311, or in law governing sport and commercial fishing generally, of any “intent to regulate the possession or sale of freshwater game fish taken outside this state.” The Court concluded that La.R.S. 56:327(A) did not “proscribe as unlawful the introduction into this State for human consumption, or the possession or sale thereof, fresh freshwater game fish taken in a foreign nation or another state of the Union, when the taking and disposition of these fish is approved as legitimate in a foreign nation or sister state of the United States.” Id. Concurring in that result, Chief Justice Dixon observed that § 311(21) could be read “to define freshwater *1127 game fish as either a species or a fish found in state waters,” and concluded that the ambiguity |4“must be interpreted favorably to defendants [charged with violating § 327].” Id., 363 So.2d at 472.
In the year following our decision in Bates, the legislature amended La.R.S. 56:327(A) to prohibit the sale or importation for sale of certain enumerated species of fish, including hybrid striped bass, or “any other species of freshwater game fish as defined in La.R.S. 56:311(21) whether taken from within or without the state,” unless each of such imported fish was tagged by the appropriate conservation agency of the state from which the fish were taken. 1979 La.Aets No. 287 (emphasis added). Since then, the legislature has frequently amended and reenacted § 327(A), adding a second exception for game fish fingerlings, 1983 La.Acts No. 522, and subdividing the section to bring within its prohibition saltwater game fish. La.R.S. 56:327(A)(l)(b); 1987 La.Acts No. 285. In 1988, the legislature added two more exceptions covering hybrid striped bass produced and regulated under the provisions of La. R.S. 56:411 governing domestic fish farming, 1988 La.Acts No. 778, and any freshwater or saltwater game fish “raised and taken in accordance with a certified aquaculture program or a valid experimental mariculture permit issued pursuant to R.S. 56:579.1.” 1988 La.Acts No. 889. Aquaculture is “the production of fish in a controlled environment in private waters on private lands.” La.R.S. 56:356. The legislature also added subsection A(l)(c) to the statute, governing notice to the Department by the buyer of any authorized shipment of imported saltwater game fish. 1988 La.Aets No. 889. Finally, in 1991, the legislature enacted La.R.S. 56:327.1 expressly to allow the importation into this state of “cultured fish,” specifically defined in that section as saltwater game fish otherwise covered by R.S. 56:327(A)(l)(b), when such fish (excluding certain named species which may inhabit the waters above and below the saltwater demarcation fine of this state, e.g. largemouth bass) are raised and harvested in a licensed |5aquaculture program of another state and prior notice of shipment is given the Department. 1991 La. Acts No. 822.
This history of La.R.S. 56:327 since 1974 leads us to conclude that the sale or the importation for sale of any fish belonging to a species of freshwater or saltwater game fish found in the waters of Louisiana is prohibited under all but specifically defined circumstances. Those exceptional circumstances include the importation of freshwater or saltwater game fish, as defined by the legislature or specified by Department rule, harvested in a licensed aquaculture program of another state. See La.R.S. 56:334.2 (for purposes of its sports-fishing license requirements, the Department shall “determine by rule which species of fish shall be classified as a freshwater species and which shall be classified as a saltwater species”); La.Admin.Code tit. 76, § VII:121 (Department rule allowing the taking of hybrid striped bass below the saltwater demarcation line of the state on a freshwater angling license); cfi, La.R.S. 56:322 (the exact line demarcating the fresh waters and salt waters of this state “is insusceptible of precise location by reason of the changes in water salinity caused by winds, tides, and rains.”) These exceptions are in the nature of affirmative defenses which excuse or justify the defendant’s conduct and which he must therefore assert and prove by a preponderance of the evidence at trial. See State v. Brand, 520 So.2d 114 (La.1988); State v. Cheatwood, 458 So.2d 907 (La.1984). Section 327(A) thereby guards against the depletion of this state’s recreational resources through commercial exploitation and reflects the “broad regulatory authority [of the state] to protect the health and safety of its citizens and the integrity of its natural resources.” Maine v. Taylor, 477 U.S. 131, 151, 106 S.Ct. 2440, 2454, 91 L.Ed.2d 110 (1986). Section 327(A) also inhibits interstate transportation of any fish taken in violation of any state law, a matter of federal regulation as well. See 16 U.S.C. § 3372(a)(2)(A) (Lacey Act) (prohibiting interstate l6commerce in fish or wildlife taken, possessed, or transported in violation of any state law); see also R. Anderson, The Lacey Act: America’s Premier Weapon in the Fight Against unlawful Wildlife Trafficking, 16 Pub.Land L.Rev. 27 (1995).
*1128 In this case, the shipment of aquacul-turally harvested Texas fish received by relator and duly reported to the Department on July 21, 1993, was large enough to have accounted for every fish seized by agent Mayne five days later. Over defense objection that they were not qualified to give an opinion regarding the decomposition of commercially harvested fish, agents Burdon and Ragillio testified that the fresh appearance of the fish negated any reasonable probability that they had originated in the July 21 shipment. Long experience as wildlife agents qualified Burdon and Ragillio to offer their opinion regarding the characteristic appearance of fresh fish. See La.C.E. art. 702 (in Louisiana, an expert may be qualified “by knowledge, skill, experience, training or education.”) The independent experts consulted by relator agreed on those same characteristics, most prominently bright red gills, indicating recent oxygenation, and firm stomachs, indicating the absence of gases produced by decomposition of the internal organs. The defense experts had examined some of the fish remaining from the July 21 shipment and concluded that by July 30, 1993, the fish were beginning to show signs of decomposition, i.e., their gills were becoming brown and their stomachs soft.
Burdon conceded, however, that he has only a degree in zoology; Ragillio has a degree in wildlife management. They had never before been qualified in court as experts in the physiology or decomposition of fish. Burdon was “not sure there may be people in the state” who could scientifically determine the age of dead fish; he thought that “you would probably have to send [the samples] to a forensic lab probably in Washington if you really wanted to get down to really specifics.” Ragillio was not aware of “any specific research” of determining the age of deadJ^fish. Burdon also acknowledged that different icing and packing techniques would “certainly” affect his opinion regarding the age of harvested fish. He conceded that someone with years in the seafood business would know how to pack fish to keep it fresher longer and that he was “sure you could” package fish for shipment in such a way that it would appear less than 72 hours old. “I am not familiar with all the seafood processes,” Burdon testified, “and I don’t know what the capabilities are with fish.” Neither he nor Ragillio offered the court an articulable basis for finding that the inspection of only four fish taken from the 50-pound boxes provided a reliable indicator and a scientific basis for determining the shipment’s overall age. The state did not recall either agent after relator took the stand and testified with regard to the techniques he claimed to have used to retain the fresh appearance of the fish he had received from Texas on July 22,1993.
Despite the weaknesses in the testimony of Burdon and Ragillio, the opinions offered by state’s experts, if unrebutted, would have provided the trial court as the fact-finder in the case a rational basis for determining beyond a reasonable doubt that relator was shipping freshwater game fish out of Louisiana in violation of state law. Nevertheless, the state’s ease, relying principally on the opinions of its experts that the fish appeared “too fresh” to have originated from a lawful source, was not a strong one, and it was rebutted by more than simply relator’s own expert testimony. Relator corroborated his testimony by providing the court with an accounting for the apparent discrepancy found in his records by the agents and with independent evidence that he had obtained a large shipment of acqua-culturally-produced hybrid striped bass from Texas only five days before the seizure of fish involved in this case. The state relied on its experts to discount the Texas shipment as merely coincidental to the otherwise unexplained transportation of 1,100 pounds of fish on July 27, 1993, but we think that any rational | gtrier of fact would have found that the two shipments were probably connected. We believe that on the evidence presented at trial, no rational factfinder could have failed to conclude that relator had carried his burden of proving his affirmative defense more probably than not that he had obtained the fish shipped on July 27 by lawful means. See State v. Peters, 94-0283 (La. 10/17/94), 643 So.2d 1222; State v. Lombard, 486 So.2d 106 (La.1986).
*1129 Accordingly, relator’s conviction and sentence are reversed and he is ordered discharged from custody in this case.
LEMMON, J., concurs and assigns reasons.

 Judge Philip C. Ciaccio, Court of Appeal, Fourth Circuit, sitting in place of Kimball, J., recused.